KEVIN C. POWERS, General Counsel
Nevada State Bar No. 6781
NEVADA LEGISLATIVE COUNSEL BUREAU, LEGAL DIVISION
401 S. Carson St.
Carson City, NV 89701
Tel: (775) 684-6830; Fax: (775) 684-6761
Email: kpowers@lcb.state.nv.us
*Attorneys for Legislative Defendants Brenda J. Erdoes, in her official capacity as Director of the Legislative Counsel Bureau of the State of Nevada, and Nicole J. Cannizzaro, in her official capacity as Chair of the Legislative Commission of the State of Nevada*

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEVADA

| | |
|---|---|
| SHAWN MEEHAN, an individual; JANINE HANSEN, an individual; LYNN CHAPMAN, an individual; and MELISSA CLEMENT, an individual,<br><br>    Plaintiffs,<br><br>    vs.<br><br>STEPHEN F. SISOLAK, in his official capacity as Governor of the State of Nevada; AARON DARNELL FORD, in his official capacity as Attorney General of the State of Nevada; BRENDA J. ERDOES, in her official capacity as Director of the Legislative Counsel Bureau of the State of Nevada; NICOLE J. CANNIZZARO, in her official capacity as Chair of the Legislative Commission of the State of Nevada; and DOES 1 through 100,<br><br>    Defendants. | Case No. 3:21-cv-00100-MMD-WGC<br><br>**LEGISLATIVE DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION (ECF NO. 6)** |

## <u>TABLE OF CONTENTS</u>

**INTRODUCTION**.................................................................................................................1

**BACKGROUND** ................................................................................................................1

    **I.   Director Erdoes' statutory authority to restrict or prohibit lobbyists and the public from entering the Building during a legislative session in order to protect the public's health, safety and welfare and provide all services necessary to the efficient and effective operation of the Legislature amid the ongoing and widespread public-health crisis caused by the COVID-19 pandemic.**....................................................1

    **II.   Procedural history of Plaintiffs' action.** ..........................................................6

**MEMORANDUM OF POINTS AND AUTHORITIES**.................................................7

    **I.   Because the Building has been reopened in a manner that allows lobbyists and the public to enter the Building under health-and-safety protocols, Director Erdoes has voluntarily ceased the conduct that was initially challenged by Plaintiffs, so their motion for preliminary injunction must be denied as moot.**...................................7

    **II.   Plaintiffs cannot, as a matter of law, obtain declaratory or injunctive relief against Senator Cannizzaro under section 1983 because she is not the state official who has been charged by the Legislature with the statutory authority to "preserve order and security" within the Building during legislative sessions.** ...............................9

    **III.   Plaintiffs cannot, as a matter of law, obtain declaratory or injunctive relief against Director Erdoes or Senator Cannizzaro under section 1983 because they are entitled to absolute legislative immunity.**....................................................................11

    **IV.   This Court should not exercise supplemental jurisdiction over Plaintiffs' state constitutional claims under Article 1, Section 1 and Article 4, Section 15 of the Nevada Constitution because those claims raise novel, complex and policy-laden issues of state law and Nevada's legislative branch has a compelling interest in ensuring that the Nevada Supreme Court decides those state-law issues of first impression.**........................16

    **V.   Plaintiffs have failed, as a matter of law, to meet their heavy burden to prove that they are entitled to a preliminary injunction because they have not proven that: (1) they are likely to succeed on the merits of their claims; (2) they are likely to suffer irreparable harm without the injunction; (3) the balance of equities tips in their favor; or (4) the issuance of the injunction is in the public interest.**.................................19

        **A.   Plaintiffs have not proven that they are likely to succeed on the merits of their claims under the First Amendment and Article 1, Sections 9 and 10 of the Nevada Constitution.**...........................................................................................20

**B.    Plaintiffs have not proven that they are likely to succeed on the merits of their claims under the Due Process Clause of the Fifth and Fourteenth Amendments.** ...................................................................................................24

**C.    Plaintiffs have not proven that they are likely to succeed on the merits of their claims under Article 1, Section 1 of the Nevada Constitution.**.................................26

**D.    Plaintiffs have not proven that they are likely to succeed on the merits of their claims under Article 4, Section 15 of the Nevada Constitution.**............................26

**E.    Plaintiffs have not proven that they are likely to suffer irreparable harm without the injunction, that the balance of equities tips in their favor or that the issuance of the injunction is in the public interest.**...........................................30

**CONCLUSION**...................................................................................................30

**CERTIFICATE OF SERVICE**........................................................................32

**INDEX OF EXHIBITS**...................................................................... Index-1

# **TABLE OF AUTHORITIES**

**CASES**

Adderley v. Florida, 385 U.S. 39 (1966)....................................................................21

Am. Cargo Transp. v. United States, 625 F.3d 1176 (9th Cir. 2010) .................7, 8

Amoco Prod. Co. v. Vill. of Gambell, 480 U.S. 531 (1987)....................................19

Bahrampour v. Lampert, 356 F.3d 969 (9th Cir. 2004) ........................................16

Bi-Metallic Inv. Co. v. State Bd. of Equal., 239 U.S. 441 (1915) ...................21, 25

Bd. of Trustees of Glazing Health & Welfare Tr. v. Chambers,
941 F.3d 1195 (9th Cir. 2019)...........................................................................7, 9

Bogan v. Scott-Harris, 523 U.S. 44 (1998) ...........................................................11

Borough of Duryea, Pa. v. Guarnieri, 564 U.S. 379 (2011) ................................23

Clark v. Cmty. for Creative Non-Violence, 468 U.S. 288 (1984) .........................21

Confederated Tribes v. Locke, 176 F.3d 467 (9th Cir. 1999)................................10

Consumers Union v. Periodical Correspondents' Ass'n, 515 F.2d 1341 (D.C. Cir. 1975) .............12

Deja Vu Showgirls v. State Dep't of Tax'n, 334 P.3d 392 (Nev. 2014)..................17, 20

Doe v. McMillan, 412 U.S. 306 (1973) ..................................................................15

Doe v. Sundquist, 106 F.3d 702 (6th Cir. 1997)....................................................18

Downing v. Kunzig, 454 F.2d 1230 (6th Cir. 1972)...............................................23

Dream Palace v. Maricopa County, 384 F.3d 990 (9th Cir. 2004) .......................17

Eastland v. U.S. Servicemen's Fund, 421 U.S. 491 (1975)...........................11, 15

Eichacker v. Paul Revere Life Ins. Co., 354 F.3d 1142 (9th Cir. 2004)...............18

Empower Texans v. Geren, 388 F.Supp.3d 738 (W.D. Tex. 2019)........................12

Ex parte Young, 209 U.S. 123 (1908).....................................................................10

Gravel v. United States, 408 U.S. 606 (1972)..........................................11, 12, 15

Hodgers-Durgin v. de la Vina, 199 F.3d 1037 (9th Cir. 1999) .................................................20, 30

Holly D. v. Cal. Inst. of Tech., 339 F.3d 1158 (9th Cir. 2003) ................................................17

Hufford v. McEnaney, 249 F.3d 1142 (9th Cir. 2001) .................................................25

Hughes v. Speaker of N.H. House of Reps., 876 A.2d 736 (N.H. 2005)..........................................21

Index Newspapers v. U.S. Marshals Serv., 977 F.3d 817 (9th Cir. 2020).....................................22

In re Chapman, 166 U.S. 661 (1897) ...............................................................13

Ins. Co. of N. Am. v. Hilton Hotels, 908 F.Supp. 809 (D. Nev. 1995)...........................................18

Int'l Franchise Ass'n v. City of Seattle, 97 F.Supp.3d 1256 (W.D. Wash. 2015) ...........................19

Jacobson v. Massachusetts, 197 U.S. 11 (1905) ...............................................................24

L.A. Branch NAACP v. L.A. Unified Sch. Dist., 714 F.2d 946 (9th Cir. 1983) ...........................10

L.A. County Bar Ass'n v. Eu, 979 F.2d 697 (9th Cir.1992) ...............................................10

Lake Country Estates v. Tahoe Reg'l Planning Agency, 440 U.S. 391 (1979) ...............................11

LaVelle v. City of Las Vegas, 447 F.Supp.3d 1015 (D. Nev. 2020) ...............................................25

Lavite v. Dunstan, 932 F.3d 1020 (7th Cir. 2019) ...............................................................23

Lawson v. Klondex Mines, 450 F.Supp.3d 1057 (D. Nev. 2020)...........................................3

Lee v. City of Los Angeles, 250 F.3d 668 (9th Cir. 2001) ...............................................................25

Long v. Van de Kamp, 961 F.2d 151 (9th Cir. 1992) ...............................................................10

Marymont v. Nev. State Banking Bd., 111 P. 295 (Nev. 1910) ...............................................26

Mayhew v. Wilder, 46 S.W.3d 760 (Tenn. Ct. App. 2001) ...............................................................21

McMorris v. Alioto, 567 F.2d 897 (9th Cir. 1978) ...............................................................23

Munaf v. Geren, 553 U.S. 674 (2008) ...............................................................19

Nat'l Ass'n of Soc. Workers v. Harwood, 69 F.3d 622 (1st Cir. 1995)....................................12, 13

Nev. Comm'n on Ethics v. Carrigan, 564 U.S. 117 (2011) ...............................................21-23

Nev. Mining Ass'n v. Erdoes, 26 P.3d 753 (Nev. 2001) ...............................................................27, 29

O'Connor v. Nevada, 27 F.3d 357 (9th Cir. 1994) ..........................................................17

People's Leg. v. Miller, No. 2:12-CV-272-JCM-VCF, 2012 WL 1119239
(D. Nev. Apr. 3, 2012) ................................................................................................17

Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n, 460 U.S. 37 (1983) ........................23

Reeder v. Madigan, 780 F.3d 799 (7th Cir. 2015) ....................................................12, 13

Reyn's Pasta Bella v. Visa USA, 442 F.3d 741 (9th Cir. 2006) ........................................3

Reza v. Pearce, 806 F.3d 497 (9th Cir. 2015) ..........................................................22, 23

Rogers v. State, 705 P.2d 664 (Nev. 1985) ....................................................................26

Seabrook v. Jacobson, 153 F.3d 70 (2d Cir. 1998) ........................................................18

Snoeck v. Brussa, 153 F.3d 984 (9th Cir. 1998) ............................................................10

S. Pac. Transp. Co. v. Brown, 651 F.2d 613 (9th Cir. 1980) ..........................................10

State v. Linares, 655 A.2d 737 (Conn. 1995).................................................................24

Supreme Ct. of Va. v. Consumers Union, 446 U.S. 719 (1980)................................11, 12

Tenney v. Brandhove, 341 U.S. 367 (1951) .............................................................11, 15

Trump Hotels v. Mirage Resorts, 140 F.3d 478 (3d Cir. 1998)......................................18

Trustees of Constr. Indus. & Laborers Health and Welfare Tr. v. Desert Valley
Landscape & Maint., 333 F.3d 923 (9th Cir. 2003)......................................................16

United States v. Bulacan, 156 F.3d 963 (9th Cir. 1998) ................................................23

United States v. Johnson, 383 U.S. 169 (1966) ..............................................................12

Univ. & Cmty. Coll. Sys. v. Nevadans for Sound Gov't, 100 P.3d 179 (Nev. 2004) ....17

U.S. Postal Serv. v. Council of Greenburgh Civic Ass'ns, 453 U.S. 114 (1981) ...........20

Ward v. Rock Against Racism, 491 U.S. 781 (1989) ......................................................23

Weinberger v. Romero-Barcelo, 456 U.S. 305 (1982) ...................................................19

Winter v. Nat. Res. Def. Council, 555 U.S. 7 (2008) ...............................................19, 20

<u>Yakus v. United States</u>, 321 U.S. 414 (1944) ...................................................................19

<u>Young v. N.Y.C. Transit Auth.</u>, 903 F.2d 146 (2d Cir. 1990) .........................................18


**UNITED STATES CONSTITUTION**

U.S. Const. amend. 1..........................................................................................passim

U.S. Const. amend. 5 (Due Process Clause) .....................................................passim

U.S. Const. amend. 11........................................................................................passim

U.S. Const. amend. 14 (Due Process Clause) ...................................................passim


**UNITED STATES CODE (U.S.C.)**

28 U.S.C. § 1331 .......................................................................................................16

28 U.S.C. § 1367 ................................................................................................16, 17

42 U.S.C. § 1983 ................................................................................................passim


**FEDERAL RULES OF CIVIL PROCEDURE (FRCP)**

FRCP 4.........................................................................................................................7

FRCP 41.......................................................................................................................6

FRCP 65.......................................................................................................................1


**FEDERAL DISTRICT COURT LOCAL RULES OF PRACTICE (LR)**

LR-II 7-2 ......................................................................................................................1


**NEVADA CONSTITUTION**

Nev. Const. art. 1, § 1 .......................................................................................passim

Nev. Const. art. 1, § 9 ...................................................................................................passim

Nev. Const. art. 1, § 10 .................................................................................................passim

Nev. Const. art. 4, § 6 .........................................................................................................13

Nev. Const. art. 4, § 15 .................................................................................................passim


**NEVADA REVISED STATUTES (NRS)**

NRS Title 17 (State Legislative Department) ....................................................................2, 3

NRS Chapter 218H ...............................................................................................................8

NRS 218E.180 ....................................................................................................................10

NRS 218F.100 ......................................................................................................................2

NRS 218F.110 .......................................................................................................1, 2, 10, 13

NRS 218F.300 .......................................................................................................1, 2, 10, 13

NRS 218F.500 .......................................................................................................1, 2, 10, 13

NRS 218F.520 .......................................................................................................1, 2, 10, 13

NRS 218F.720 .......................................................................................................................1

NRS Chapter 218H ...............................................................................................................8

NRS 218H.080 (2019) ...........................................................................................................8

NRS 218H.080 (2021) ...........................................................................................................9

NRS 331.070 .........................................................................................................................1

NRS 331.120 .........................................................................................................................1

NRS 331.130 .........................................................................................................................1

NRS 331.133 .........................................................................................................................1

NRS 331.135 .........................................................................................................................1

**NEVADA LEGISLATIVE BILLS AND RESOLUTIONS**

Assemb. Bill 110, 81st Leg., 2021 Reg. Sess. (Nev. eff. Mar. 18, 2021) .....................................8, 9

Assemb. Res. 1, 81st Leg., 2021 Reg. Sess. (Nev. eff. Feb. 1, 2021)................................................13

Sen. Res. 1, 81st Leg., 2021 Reg. Sess. (Nev. eff. Feb. 1, 2021)....................................................13

**NEVADA LEGISLATIVE STANDING RULES**

Assembly Standing Rule No. 11 ...........................................................................................3

Assemb. Standing R. 122 .....................................................................................................14

Assemb. Standing R. 125 .....................................................................................................13

Senate Standing Rule No. 13 ...............................................................................................3

Sen. Standing R. 132 ...........................................................................................................14

Sen. Standing R. 135 ...........................................................................................................13

**OTHER AUTHORITIES**

Luther S. Cushing, Elements of the Law & Practice of Legislative Assemblies § 343 (1856) .......22

Debates & Proceedings of the Nevada State Constitutional Convention of 1864,
(Andrew J. Marsh off. rep. 1866)....................................................................................27

Legislative History of S.J.R. 7, 66th Leg. (Nev. LCB Research Library 1991) .......................28, 29

Michelle Rindels, Public will be barred from attending Legislature's forthcoming
special session in-person, The Nevada Independent (June 26, 2020)................................3

Nev. Ballot Questions 1994, Question No. 2, at 1 (Nev. Sec'y of State 1994) ..............................29

## INTRODUCTION

Legislative Defendants Brenda J. Erdoes, in her official capacity as Director of the Legislative Counsel Bureau of the State of Nevada ("Director Erdoes"), and Nevada State Senator Nicole J. Cannizzaro, in her official capacity as Chair of the Legislative Commission of the State of Nevada ("Senator Cannizzaro"), by and through their counsel the Legal Division of the Legislative Counsel Bureau ("LCB Legal") under Nevada Revised Statutes ("NRS") 218F.720, hereby file their Response in Opposition to Plaintiffs' Motion for Preliminary Injunction (ECF No. 6), which was filed on February 24, 2021. This response is made under FRCP 65(a) and LR-II 7-2 and is based upon the following Memorandum of Points and Authorities and all pleadings, documents and exhibits on file in this case.

## BACKGROUND

**I.    Director Erdoes' statutory authority to restrict or prohibit lobbyists and the public from entering the Building during a legislative session in order to protect the public's health, safety and welfare and provide all services necessary to the efficient and effective operation of the Legislature amid the ongoing and widespread public-health crisis caused by the COVID-19 pandemic.**

Under Nevada law, the Legislative Building in Carson City is a separate building from the State Capitol Building, which contains offices for the state executive branch and is under the supervision and control of that branch. NRS 331.070, 331.120, 331.130, 331.133, 331.135. By contrast, the Legislature has given the state legislative branch the statutory authority to supervise and control the Legislative Building ("Building") and the grounds surrounding the Building during and between legislative sessions. NRS 331.135. The Legislature has assigned that statutory authority to Director Erdoes as the executive head of the LCB.  NRS 218F.110(1), 218F.300(1), 218F.500(2), 218F.520(1).

The LCB consists of the Legislative Commission, the Interim Finance Committee, the Director and five divisions: Administrative Division, Audit Division, Fiscal Analysis Division,

Legal Division and Research Division. NRS 218F.100(1). The Director "serves as the executive head of the Legislative Counsel Bureau and shall direct and supervise all of its administrative and technical activities." NRS 218F.110(1). The LCB's divisions are also administered by chiefs of the divisions, who must "perform the respective duties assigned to them by law under the administrative supervision of the Director." NRS 218F.100(2)-(5), 218F.110(1). The Director may also serve as the chief of any of the LCB's divisions. NRS 218F.100(6).

As part of their statutory powers and duties, the LCB's divisions provide all legal, fiscal, research, audit, administrative, technical and other services necessary to the efficient and effective operation of the Legislature. NRS Title 17 (State Legislative Department). For example, the LCB is required to provide "[a]ll administrative services necessary to the operation of the Legislature during and between regular and special sessions." NRS 218F.300(1). To carry out the supervision and control of the Building and the grounds surrounding the Building during and between legislative sessions, the Legislature has made the LCB responsible for "[s]ecurity" and has invested the LCB with the statutory authority to "preserve order and security" within the Building and on the grounds surrounding the Building. NRS 218F.500(2)(i), 218F.520(1). Thus, as the executive head of the LCB, Director Erdoes has the statutory authority and responsibility to ensure that the LCB is able to fulfill its statutory mission to: (1) protect the public's health, safety and welfare within the Building and on the grounds surrounding the Building; and (2) provide all services necessary to the efficient and effective operation of the Legislature. NRS Title 17.

On June 26, 2020, LCB Legal provided Director Erdoes with a legal opinion regarding the Director's authority to restrict or prohibit the public from entering the Building during a legislative session in order to protect the public's health, safety and welfare and provide all services necessary to the efficient and effective operation of the Legislature amid the ongoing and

widespread public-health crisis caused by the pandemic.[1] (Legis. Defs.' Ex. 1.) The legal opinion was released publicly, and the media published the legal opinion on publicly accessible websites.[2] In the legal opinion, LCB Legal advised Director Erdoes regarding the following issues:

> After considering the plain meaning of the statutory language in NRS Title 17 giving the Director—as the executive head of the LCB—the statutory authority to "preserve order and security" within the Legislative Building during a legislative session, and after interpreting that statutory language in line with what reason and public policy would indicate the Legislature intended, it is the opinion of this office that the Legislature's grant of statutory authority to the Director under NRS Title 17 allows the Director to restrict or prohibit the public from entering the Legislative Building during a legislative session in order to protect the public's health, safety and welfare and provide all services necessary to the efficient and effective operation of the Legislature amid the ongoing and widespread public-health crisis caused by the COVID-19 pandemic.

> Furthermore, after interpreting the provisions of Article 4, Section 15 governing "open" legislative floor sessions and committee meetings according to what history, reason and public policy would indicate the drafters and the voters intended, it is the opinion of this office that if the Director exercises the statutory authority granted by the Legislature under NRS Title 17 to restrict or prohibit the public from entering the Legislative Building during a legislative session, the Director's action would comport with the requirement that legislative floor sessions and committee meetings must be "open" to the public under Article 4, Section 15, so long as the Director—as the executive head of the LCB—enables reasonable alternative means of communication which provide the public with the opportunity to observe the legislative floor sessions and committee meetings and communicate with Legislators without being physically present in the Legislative Building.  Moreover, because each House's standing rules are modeled on the provisions of Article 4, Section 15 governing "open" legislative floor sessions and committee meetings, it is the opinion of this office that the same legal conclusion applies to the requirement that legislative floor sessions and committee meetings must be "open" to the public under Assembly Standing Rule No. 11 and Senate Standing Rule No. 13.

> Finally, if the Director exercises the statutory authority granted by the Legislature under NRS Title 17 to restrict or prohibit the public from entering the Legislative

---

[1] Legislative Defendants request this Court to take judicial notice of their exhibits as "matters of public record." Lawson v. Klondex Mines, 450 F.Supp.3d 1057, 1070-71 (D. Nev. 2020) (quoting Reyn's Pasta Bella v. Visa USA, 442 F.3d 741, 746 n.6 (9th Cir. 2006)).

[2] See, e.g., Michelle Rindels, Public will be barred from attending Legislature's forthcoming special session in-person, The Nevada Independent (June 26, 2020), available at: https://thenevadaindependent.com/article/public-will-be-barred-from-attending-legislatures-forthcoming-special-session-in-person.

Building during a legislative session, it is the opinion of this office that the Director's action would comport with the rights of the public to free speech, to associate or assemble together, to instruct their legislative representatives and to petition the Legislature for redress of grievances under the First Amendment to the United States Constitution and Article 1, Sections 9 and 10 of the Nevada Constitution, so long as the Director—as the executive head of the LCB—enables reasonable alternative means of communication which provide the public with the opportunity to observe the legislative floor sessions and committee meetings and communicate with Legislators without being physically present in the Legislative Building.

(Legis. Defs.' Ex. 1 at 019-20.)

On Jan. 21, 2021, Director Erdoes issued a press release explaining how the Legislature would operate **initially** within the Building during the 81st session beginning on Feb. 1, 2021. (Legis. Defs.' Ex. 2.) Director Erdoes explained that the Building would be closed to all persons other than legislators, essential staff and a small news media pool. (Legis. Defs.' Ex. 2 at 001.) Director Erdoes also explained that the LCB would enable reasonable alternative means of communication which provide lobbyists and the public with the opportunity to observe legislative floor sessions and committee meetings and communicate with legislators without being physically present in the Building, as follows:

The 81st Session of the Nevada Legislature will begin on February 1, 2021, with the Legislative Building closed to all persons other than Legislators, essential staff and a small news media pool. Those persons who are not in the building will be able to observe all of the floor sessions in the Chambers of both houses and all committee hearings in the various hearing rooms throughout the building via the Legislature's Website "View Events" Tab and YouTube. Access for persons not in the Legislative Building to observe and participate in the committee hearings will be available by reservation through the Legislature's Website for videoconference participation through Zoom. This reservation system will be available prior to session and a tutorial will be included. In addition, persons not in the Legislative Building may provide public comment to committees by telephone or choose to participate in committee hearings via videoconference at designated sites which are currently being developed in various locations in the State. Virtual meetings between individual Legislators and persons who are not in the building will be made possible through Microsoft Teams. A weekly COVID-19 testing regimen for Legislators, staff and the news media pool in the building will be in place during the time the building is closed.

(Legis. Defs.' Ex. 2 at 001.)

-4-

Finally, Director Erdoes explained that after legislators and essential staff received both doses of the COVID-19 vaccination, the Legislature would initiate a plan to begin reopening the Building to lobbyists and the public under certain health-and-safety protocols:

> After Legislators and essential staff have received both COVID-19 vaccinations, the Legislature will initiate a plan to begin opening the Legislative Building to members of the Public and registered Lobbyists to participate in committee hearings in person, by reservation through the Legislature's Website. This reservation system will be available prior to the opening of the building to the Public and Lobbyists and a tutorial will be included. Each person who participates in person in a committee hearing will be required to present a completed COVID-19 vaccination card or take a shallow nasal swab Rapid COVID-19 test before entering the building. The tests will be provided on site at no cost to the person being tested.

(Legis. Defs.' Ex. 2 at 001.)

On Apr. 9, 2021, Director Erdoes issued a press release announcing the reopening plan for the Building. (Legis. Defs.' Ex. 3 at 001.) On Apr. 15, 2021, the Building was reopened under certain health-and-safety protocols, and lobbyists and the public are allowed to enter the Building after making an appointment and complying with the health-and-safety protocols using the following appointment process:

> Appointments to enter the Legislative Building must be received at least 24 hours in advance. The number of people who will be able to make an appointment to attend a hearing held by a standing committee will be limited to a specified number per committee, which will be based upon the current COVID-19 restrictions applicable at the time of the meeting. In addition, each Legislator will be authorized to bring in one person per day to meet with the Legislator in person in the Legislative Building. When a Legislator approves a meeting with the person, the staff of the Legislator will enter the appointment into the electronic reservation system. Therefore, the process for making appointments will be a little different depending on the purpose for the visit to the Legislative Building.

(Legis. Defs.' Ex. 3 at 001.) Therefore, Director Erdoes has voluntarily ceased the conduct that was initially challenged by Plaintiffs, and they are now allowed to enter the Building after making an appointment and complying with the health-and-safety protocols.

**II.   Procedural history of Plaintiffs' action.**

On Feb. 17, 2021, Plaintiffs filed a complaint for damages and injunctive and declaratory relief under the federal civil rights statute in 42 U.S.C. § 1983. (ECF No. 1.) Plaintiffs are four individuals who, on behalf of themselves, seek entry to the Building to engage in lobbying activities. (ECF No. 1 at 1-2.) In their complaint, Plaintiffs alleged that they have been deprived of federal and state constitutional rights as a result of the decisions of Director Erdoes, as the executive head of the LCB, to restrict or prohibit lobbyists and the public from physically entering the Building in response to the pandemic. (ECF No. 1 at 18-25.)

In their complaint, Plaintiffs named several state officers of the executive branch and legislative branch as defendants in their official capacities. (ECF No. 1 at 1-2.) As named in the complaint, the Executive Defendants were: (1) Stephen F. Sisolak, in his official capacity as Governor of the State of Nevada; and (2) Aaron D. Ford, in his official capacity as Attorney General of the State of Nevada. (ECF No. 1 at 1-2.) On Mar. 23, 2021, pursuant to FRCP 41(a)(1)(A)(i), Plaintiffs voluntarily dismissed, without prejudice, those Executive Defendants from this action. (ECF No. 21.) As named in the complaint, Legislative Defendants are Director Erdoes and Senator Cannizzaro in her official capacity as Chair of the Legislative Commission. (ECF No. 1 at 1-2.)

On Feb. 24, 2021, Plaintiffs filed an emergency motion for preliminary injunction based on their federal and state constitutional claims. (ECF No. 6.) On Feb. 25, 2021, this Court entered a minute order (ECF No. 8), stating that:

> The Court has reviewed Plaintiff's motion for preliminary injunction (ECF No. 6, the "PI" motion.)   The normal briefing schedule will apply to the motion because Plaintiffs do not specifically request an expedited briefing schedule in their PI motion and did not otherwise establish they are entitled to an expedited briefing schedule under LR 7-4.   The Court will determine whether to set a hearing upon reviewing the subsequent briefs.

On Mar. 1, 2021, Plaintiffs filed a notice of appeal to the Ninth Circuit to challenge this Court's minute order regarding the briefing schedule for the motion for preliminary injunction. (ECF No. 11.) On Mar. 10, 2021, the Ninth Circuit entered an order dismissing Plaintiffs' appeal for lack of appellate jurisdiction because "the district court's February 25, 2021 minute order [was] not a final or appealable order." (ECF No. 15.)

On Mar. 31, 2021, this Court approved a Stipulation and Order Regarding Service of Process on Legislative Defendants, Briefing Schedule for Motions, and Related Matters. (ECF No. 25.) Under the stipulation and order, Legislative Defendants agreed to appear voluntarily in this action and waived their rights to be served by Plaintiffs with a summons and complaint under FRCP 4. (ECF No. 25 at 3.) The parties also agreed to a briefing schedule for Plaintiffs' motion for preliminary injunction. (ECF No. 25 at 3-4.)

## MEMORANDUM OF POINTS AND AUTHORITIES

**I.   Because the Building has been reopened in a manner that allows lobbyists and the public to enter the Building under health-and-safety protocols, Director Erdoes has voluntarily ceased the conduct that was initially challenged by Plaintiffs, so their motion for preliminary injunction must be denied as moot.**

As a general rule, "[a] private defendant's voluntary cessation of challenged conduct does not necessarily render a case moot because, if the case were dismissed as moot, the defendant would be free to resume the conduct." Bd. of Trustees of Glazing Health & Welfare Tr. v. Chambers, 941 F.3d 1195, 1198 (9th Cir. 2019) (en banc). However, courts "treat the voluntary cessation of challenged conduct by **government officials** 'with more solicitude . . . than similar action by private parties.'" Id. (quoting Am. Cargo Transp. v. United States, 625 F.3d 1176, 1180 (9th Cir. 2010) (emphasis added)). The reason for this rule is that "[t]he government's change of policy presents a special circumstance in the world of mootness. Of course there is always the possibility of bad faith and a change of heart. But, unlike in the case of a private party, we

presume the government is acting in good faith." <u>Am. Cargo Transp.</u>, 625 F.3d at 1180.

In their motion, Plaintiffs challenge Director Erdoes' decisions to restrict or prohibit lobbyists and the public from entering the Building in order to protect the public's health, safety and welfare and provide all services necessary to the efficient and effective operation of the Legislature amid the ongoing and widespread public-health crisis caused by the pandemic. (ECF No. 6 at 17-19, 22-30.) However, on Apr. 15, 2021, the Building was reopened under health-and-safety protocols, and lobbyists and the public are allowed to enter the Building after making an appointment and complying with the health-and safety protocols. (Legis. Defs.' Ex. 3 at 001.) Therefore, Director Erdoes has voluntarily ceased the conduct that was initially challenged by Plaintiffs, and they are now allowed to enter the Building after making an appointment and complying with the health-and-safety protocols. Because Director Erdoes has changed the policy initially challenged by Plaintiffs, their motion must be denied as moot.

Additionally, in their motion, Plaintiffs complain that, during the 81st session, they have been precluded from registering as lobbyists under the Nevada Lobbying Disclosure and Regulation Act ("Lobbying Act") in NRS Chapter 218H. (ECF No. 6 at 17-19.) At the beginning of the 81st session, the Lobbying Act defined the term "lobbyist" as follows:

> 1.  "Lobbyist" means, except as limited by subsection 2, a person who:
> (a) **Appears in person** in the Legislative Building or any other building in which the Legislature or any of its standing committees hold meetings; and
> (b) Communicates directly with a member of the Legislative Branch on behalf of someone other than himself or herself to influence legislative action, whether or not any compensation is received for the communication.

NRS 218H.080 (2019) (emphasis added).

However, during the 81st session, the Legislature enacted legislation amending the definition of "lobbyist" to remove the requirement that a lobbyist must appear in person in the Building. Assemb. Bill 110, 81st Leg., 2021 Reg. Sess., § 2 (Nev. eff. Mar. 18, 2021). As a result,

the definition of "lobbyist" now reads as follows:

> 1.  "Lobbyist" means, except as limited by subsection 2, a person who communicates directly with a member of the Legislative Branch on behalf of someone other than himself or herself to influence legislative action, whether or not any compensation is received for the communication.

NRS 218H.080 (2021).  In the legislation, the Legislature also provided that:

> **Sec. 3.**   During the 81st Session of the Nevada Legislature, any person who, on or after the effective date of this act [Mar. 18, 2021], qualifies as a lobbyist pursuant to NRS 218H.080, as amended by section 2 of this act, must:
> 1.   File a registration statement pursuant to NRS 218H.200, as amended by section 2.3 of this act, not later than 14 days after the effective date of this act, or not later than 2 days after the beginning of the person's lobbying activity as set forth in NRS 218H.200, as amended by section 2.3 of this act, whichever date is later, unless the person qualifies for an exemption or exception from the requirements to register as a lobbyist pursuant to any regulations adopted in accordance with NRS 218H.500.

Assemb. Bill 110, 81st Leg., 2021 Reg. Sess., § 3 (Nev. eff. Mar. 18, 2021). Consequently, Plaintiffs are now required to register as lobbyists under the Lobbying Act.

The Ninth Circuit has recently clarified that "in determining whether a case is moot, we should presume that the repeal, amendment, or expiration of legislation will render an action challenging the legislation moot, unless there is a reasonable expectation that the legislative body will reenact the challenged provision or one similar to it." Chambers, 941 F.3d at 1199. In this case, the Legislature's amendments to the Lobbying Act have rendered Plaintiffs' complaints regarding lobbyist registration moot.

**II.   Plaintiffs cannot, as a matter of law, obtain declaratory or injunctive relief against Senator Cannizzaro under section 1983 because she is not the state official who has been charged by the Legislature with the statutory authority to "preserve order and security" within the Building during legislative sessions.**

Under the Ex parte Young exception to a state's Eleventh Amendment immunity from suit in federal court, a plaintiff may bring federal claims under section 1983 asking for prospective declaratory or injunctive relief against state officials acting in their official capacities to enjoin

1   their allegedly unconstitutional actions. Ex parte Young, 209 U.S. 123, 155-56 (1908); L.A.

2   Branch NAACP v. L.A. Unified Sch. Dist., 714 F.2d 946, 952 (9th Cir. 1983). However, implicit

3   in the right to sue state officials under the Ex parte Young exception to Eleventh Amendment

4   immunity is the requirement that the state officials must bear some connection to the allegedly

5   unconstitutional actions. Long v. Van de Kamp, 961 F.2d 151, 152 (9th Cir. 1992); S. Pac. Transp.

6   Co. v. Brown, 651 F.2d 613, 615 (9th Cir. 1980). As explained by the Supreme Court:

7   In making an officer of the state a party defendant in a suit to enjoin the enforcement
    of an act alleged to be unconstitutional, **it is plain that such officer must have some**
8   **connection with the enforcement of the act**, or else it is merely making him a party
    as a representative of the state, and thereby attempting to make the state a party.
9

10  Ex parte Young, 209 U.S. at 157 (emphasis added).

11      The connection necessary to trigger the Ex parte Young exception to Eleventh Amendment

12  immunity "must be determined under state law depending on whether and under what

13  circumstances a particular defendant has a connection with the challenged state law." Snoeck v.

14  Brussa, 153 F.3d 984, 986 (9th Cir. 1998). The connection "must be fairly direct; a generalized

15  duty to enforce state law or **general supervisory power** over the persons responsible for

16  enforcing the challenged provision will not subject an official to suit." L.A. County Bar Ass'n v.

17  Eu, 979 F.2d 697, 704 (9th Cir.1992) (emphasis added); Confederated Tribes v. Locke, 176 F.3d

18  467, 469-70 (9th Cir. 1999); Long, 961 F.2d at 151; S. Pac. Transp., 651 F.2d at 615.

19      As discussed previously, the Legislature has charged the LCB Director, as the executive

20  head of the LCB, with the specific statutory authority to "preserve order and security" within the

21  Building during legislative sessions. NRS 218F.110(1), 218F.300(1), 218F.500(2), 218F.520(1).

22  By contrast, the Legislature has charged the Legislative Commission with the general statutory

23  authority to "[s]upervise the functions assigned to the Divisions of the Legislative Counsel Bureau

24  by this title or any law or resolution." NRS 218E.180(5).

In their complaint, Plaintiffs named Senator Cannizzaro as a defendant in her official capacity as Chair of the Legislative Commission based solely on the Legislative Commission's general supervisory power over the LCB. (ECF No. 1 at 2, ¶ 4; 9-10, ¶¶ 34-39.) In their motion, Plaintiffs do not contend that Senator Cannizzaro, like Director Erdoes, has been charged by the Legislature with the specific statutory authority to "preserve order and security" within the Building during legislative sessions. (ECF No. 6 at 13-14.)

Under well-established case law, the Legislative Commission's general supervisory power over the LCB does not give the Legislative Commission—or Senator Cannizzaro in her official capacity as Chair—the connection necessary to trigger the Ex parte Young exception to Eleventh Amendment immunity. Therefore, Plaintiffs cannot, as a matter of law, obtain declaratory or injunctive relief against Senator Cannizzaro under section 1983 because she is not the state official who has been charged by the Legislature with the statutory authority to "preserve order and security" within the Building during legislative sessions. For that reason, Plaintiffs' motion for preliminary injunction against Senator Cannizzaro must be denied as a matter of law.

**III.   Plaintiffs cannot, as a matter of law, obtain declaratory or injunctive relief against Director Erdoes or Senator Cannizzaro under section 1983 because they are entitled to absolute legislative immunity.**

The federal common law provides legislators and legislative staff with absolute legislative immunity in federal court for any civil claims under section 1983 arising from acts that fall within the sphere of legitimate legislative activity. Tenney v. Brandhove, 341 U.S. 367, 372-76 (1951); Gravel v. United States, 408 U.S. 606, 616-18 (1972); Eastland v. U.S. Servicemen's Fund, 421 U.S. 491, 507-10 (1975); Lake Country Estates v. Tahoe Reg'l Planning Agency, 440 U.S. 391, 403-06 (1979); Bogan v. Scott-Harris, 523 U.S. 44, 54-56 (1998). The Supreme Court has generally "equated the legislative immunity to which state legislators are entitled under § 1983 to that accorded Congressmen under the Constitution." Supreme Ct. of Va. v. Consumers Union, 446

U.S. 719, 733 (1980). Under absolute legislative immunity, legislators and legislative staff are protected in federal court from having to defend themselves against civil claims challenging actions taken by them in their official legislative capacity, regardless of whether those claims seek monetary relief or declaratory and injunctive relief.  Id. at 731-34.

The Supreme Court has consistently held that absolute legislative immunity "will be read broadly to effectuate its purposes." United States v. Johnson, 383 U.S. 169, 180 (1966). The Supreme Court has described the primary purpose of absolute legislative immunity as follows:

> The purpose of this immunity is to insure that the legislative function may be performed independently without fear of outside interference.  To preserve legislative independence, we have concluded that legislators engaged in the sphere of legitimate legislative activity should be protected not only from the consequences of litigation's results but also from the burden of defending themselves.

Consumers Union, 446 U.S. at 731-32 (internal quotations and citations omitted). The Supreme Court has also determined that the protection of absolute legislative immunity "applies not only to a Member but also to his aides insofar as the conduct of the latter would be a protected legislative act if performed by the Member himself." Gravel, 408 U.S. at 618.

Several federal courts have found that absolute legislative immunity protects legislators and legislative staff from actions for monetary, declaratory and injunctive relief which challenge decisions that restrict or prohibit lobbyists, the press or the public from having access to legislative chambers or other legislative facilities in order to protect the safety, integrity and due functioning of the legislative process. Reeder v. Madigan, 780 F.3d 799, 802-06 (7th Cir. 2015); Nat'l Ass'n of Soc. Workers v. Harwood, 69 F.3d 622, 629-35 (1st Cir. 1995); Consumers Union v. Periodical Correspondents' Ass'n, 515 F.2d 1341, 1347-51 (D.C. Cir. 1975); Empower Texans v. Geren, 388 F.Supp.3d 738, 742-48 (W.D. Tex. 2019), vacated as moot, 977 F.3d 367, 372 (5th Cir. 2020) (finding that Empower's appeal had become moot because "Empower never asked this court to expedite its appeal."). These federal courts have applied the protection of absolute legislative

immunity to decisions curtailing access to legislative chambers or other legislative facilities because of their "view of a legislature's House as its castle." <u>Harwood</u>, 69 F.3d at 632. And these federal courts have recognized that controlling access to legislative chambers or other legislative facilities is "a core legislative function" that must be protected by absolute legislative immunity because "[a] contrary rule would make it nearly impossible for a legislature to function, as it would potentially subject legislators and their aides to liability for every floor-access decision they make." <u>Reeder</u>, 780 F.3d at 803-04.

In this case, the Legislature has charged Director Erdoes, as the executive head of the LCB, with the specific statutory authority to "preserve order and security" within the Building during legislative sessions. NRS 218F.110(1), 218F.300(1), 218F.500(2), 218F.520(1). Based on that statutory authority, Director Erdoes made decisions to restrict or prohibit lobbyists and the public from entering the Building in order to protect the public's health, safety and welfare and provide all services necessary to the efficient and effective operation of the Legislature amid the ongoing and widespread public-health crisis caused by the pandemic.

Director Erdoes' decisions have been guided by the Standing Rules adopted for the 81st session by the Houses under: (1) their constitutional powers to determine the rules of their proceedings; and (2) their inherent powers of institutional self-protection and self-preservation. Nev. Const. art. 4, § 6; <u>In re Chapman</u>, 166 U.S. 661, 668 (1897) (explaining that each House "necessarily possesses the inherent power of self-protection."); Assemb. Standing R. 125; Sen. Standing R. 135.[3] In particular, each House has adopted Remote-Technology Rules allowing legislators to participate in the legislative process using remote-technology systems to serve the following public purposes:

---

[3] The Standing Rules were adopted, respectively, in Assemb. Res. 1, 81st Leg., 2021 Reg. Sess. (Nev. eff. Feb. 1, 2021), and Sen. Res. 1, 81st Leg., 2021 Reg. Sess. (Nev. eff. Feb. 1, 2021).

1.    The Remote-Technology Rules are intended to serve the following public purposes:

(a)  To protect the health, safety and welfare of Legislators, members of legislative staff and others who participate in the legislative process amid the ongoing and widespread public-health crisis caused by the COVID-19 pandemic, the Remote-Technology Rules are intended to authorize necessary protective and safety measures intended to keep the legislative process as safe and free as reasonably possible from the extraordinary danger, risk, harm, injury and peril posed by the COVID-19 pandemic.

(b)  To enable the members of the [House] to represent their constituents and carry out their official powers, functions, duties and responsibilities in the legislative process amid the ongoing and widespread public-health crisis caused by the COVID-19 pandemic, the Remote-Technology Rules are intended to authorize members of the [House], under certain circumstances, to use remote-technology systems to attend, participate, vote and take any other action in legislative proceedings when determined to be necessary as a protective or safety measure to keep the legislative process as safe and free as reasonably possible from the extraordinary danger, risk, harm, injury and peril posed by the COVID-19 pandemic.

(c)  To safeguard the workings of the Legislative Department of Nevada's State Government and preserve and protect the continuity and efficacy of its legislative operations amid the ongoing and widespread public-health crisis caused by the COVID-19 pandemic, the Remote-Technology Rules are intended to ensure that the [House] may efficiently and effectively carry out its official powers, functions, duties and responsibilities which are expressly and exclusively assigned to the [House] by the Nevada Constitution and which cannot be exercised or performed by any other body or branch of Nevada's State Government.

Assemb. Standing R. 122; Sen. Standing R. 132.

Like the decisions of each House to adopt the Remote-Technology Rules in response to the pandemic, Director Erdoes' decisions to control access to the Building in response to the pandemic are intended to serve legitimate legislative purposes to keep the legislative process as safe and free as reasonably possible from the extraordinary danger, risk, harm, injury and peril posed by the pandemic. Because Director Erdoes' decisions serve such legitimate legislative purposes to protect the safety, integrity and due functioning of the legislative process, her decisions constitute core legislative functions within the sphere of legitimate legislative activity, and she is protected by absolute legislative immunity as a matter of law.

In addition, even assuming that Senator Cannizzaro in her official capacity as Chair of the Legislative Commission is involved in the supervision of Director Erdoes' decisions to control access to the Building, Senator Cannizzaro's actions are similarly protected by absolute legislative immunity as a matter of law. As already established, the Legislative Commission's general supervisory power over the LCB does not give the Legislative Commission—or Senator Cannizzaro in her official capacity as Chair—the connection necessary to trigger the Ex parte Young exception to Eleventh Amendment immunity. Nevertheless, even if Plaintiffs could invoke the Ex parte Young exception to Eleventh Amendment immunity, Senator Cannizzaro still would be protected by absolute legislative immunity for all legislative actions taken in her official capacity as Chair of the Legislative Commission.

In several cases, the Supreme Court has found that legislators are entitled to absolute legislative immunity for all legislative actions taken in their official capacities as committee chairs, including actions involving their supervision of legislative staff engaged in core legislative functions within the sphere of legitimate legislative activity. See, e.g., Tenney, 341 U.S. at 372-79; Gravel, 408 U.S. at 613-22; Eastland, 421 U.S. at 501-10.  As explained by the Supreme Court:

> Congressmen and their aides are immune from liability for their actions within the "legislative sphere," even though their conduct, if performed in other than legislative contexts, would in itself be unconstitutional or otherwise contrary to criminal or civil statutes.  Although we might disagree with the Committee as to whether it was necessary . . . or even remotely useful [to take the actions being challenged], we have no authority to oversee the judgment of the Committee in this respect or to impose liability on its Members if we disagree with their legislative judgment.

Doe v. McMillan, 412 U.S. 306, 312-13 (1973) (quoting Gravel, 408 U.S. at 624-25).

As discussed previously, because Director Erdoes' decisions to control access to the Building serve legitimate legislative purposes to protect the safety, integrity and due functioning of the legislative process, her decisions constitute core legislative functions within the sphere of legitimate legislative activity and are protected by absolute legislative immunity. Consequently,

even assuming that Senator Cannizzaro in her official capacity as Chair of the Legislative Commission is involved in the supervision of Director Erdoes' decisions, any such supervisory actions constitute core legislative functions within the sphere of legitimate legislative activity, and Senator Cannizzaro is protected by absolute legislative immunity as a matter of law.

Accordingly, Plaintiffs cannot, as a matter of law, obtain declaratory or injunctive relief against Director Erdoes or Senator Cannizzaro under section 1983 because they are entitled to absolute legislative immunity. For that reason, Plaintiffs' motion for preliminary injunction against Director Erdoes and Senator Cannizzaro must be denied as a matter of law.

**IV.   This Court should not exercise supplemental jurisdiction over Plaintiffs' state constitutional claims under Article 1, Section 1 and Article 4, Section 15 of the Nevada Constitution because those claims raise novel, complex and policy-laden issues of state law and Nevada's legislative branch has a compelling interest in ensuring that the Nevada Supreme Court decides those state-law issues of first impression.**

This Court has original jurisdiction over Plaintiffs' federal constitutional claims alleging violations of the First, Fifth and Fourteenth Amendments because those claims arise under the Federal Constitution. 28 U.S.C. § 1331. This Court has supplemental jurisdiction over Plaintiffs' state constitutional claims only if they "are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a). As a general rule, a state claim "is part of the same case or controversy when it shares a 'common nucleus of operative fact' with the federal claims and the state and federal claims would normally be tried together." Bahrampour v. Lampert, 356 F.3d 969, 978 (9th Cir. 2004) (quoting Trustees of Constr. Indus. & Laborers Health and Welfare Tr. v. Desert Valley Landscape & Maint., 333 F.3d 923, 925 (9th Cir. 2003)).

When this Court has supplemental jurisdiction over a state constitutional claim, it ordinarily must exercise that supplemental jurisdiction unless the Court articulates case-specific reasons for declining supplemental jurisdiction that are authorized under 28 U.S.C. § 1367(c). Bahrampour,

356 F.3d at 978-79. Under section 1367(c), this Court is authorized to decline supplemental jurisdiction over a state constitutional claim when "the claim raises a novel or complex issue of State law" or, "in exceptional circumstances, [when] there are other compelling reasons for declining jurisdiction." 28 U.S.C. §§ 1367(c)(1) & 1367(c)(4); People's Leg. v. Miller, No. 2:12-CV-272-JCM-VCF, 2012 WL 1119239, at *2-4 (D. Nev. Apr. 3, 2012).

In this case, this Court should exercise supplemental jurisdiction over Plaintiffs' state constitutional claims under Article 1, Sections 9 and 10 of the Nevada Constitution because the Nevada Supreme Court has ruled that those provisions are coextensive with the rights protected by the First Amendment. Deja Vu Showgirls v. State Dep't of Tax'n, 334 P.3d 392, 398 n.7 (Nev. 2014); Univ. & Cmty. Coll. Sys. v. Nevadans for Sound Gov't, 100 P.3d 179, 187 (Nev. 2004); People's Leg., 2012 WL 1119239, at *3. However, this Court should not exercise supplemental jurisdiction over Plaintiffs' state constitutional claims under Article 1, Section 1 and Article 4, Section 15 of the Nevada Constitution because those claims raise novel, complex and policy-laden issues of state law and Nevada's legislative branch has a compelling interest in ensuring that the Nevada Supreme Court—as the final interpreter of the meaning of the Nevada Constitution—decides those state-law issues of first impression. 28 U.S.C. §§ 1367(c)(1) & 1367(c)(4); People's Leg., 2012 WL 1119239, at *3-4.

In determining whether to exercise supplemental jurisdiction, this Court should decline to rule on novel, complex or policy-laden issues of state law. Holly D. v. Cal. Inst. of Tech., 339 F.3d 1158, 1181 n.28 (9th Cir. 2003); O'Connor v. Nevada, 27 F.3d 357, 363 (9th Cir. 1994) (explaining that "the difficult question of Nevada constitutional law presented is the very sort of 'novel' issue that usually will justify declining jurisdiction over the claim."). This Court should be wary of ruling on state constitutional issues because such issues typically involve the state's sovereign interest in administering its own system of government. Dream Palace v. Maricopa

1  County, 384 F.3d 990, 1022 (9th Cir. 2004); Seabrook v. Jacobson, 153 F.3d 70, 72 (2d Cir.

2  1998); Trump Hotels v. Mirage Resorts, 140 F.3d 478, 487 (3d Cir. 1998); Doe v. Sundquist, 106

3  F.3d 702, 708 (6th Cir. 1997). This Court also should be wary of ruling on state constitutional

4  issues because federal courts generally do not provide the best forum for interpreting state-specific

5  constitutional provisions which do not have a similar federal counterpart. Young v. N.Y.C. Transit

6  Auth., 903 F.2d 146, 164 (2d Cir. 1990).

7          In this case, Plaintiffs' state constitutional claims under Article 1, Section 1 and Article 4,

8  Section 15 of the Nevada Constitution raise novel, complex and policy-laden issues of state law

9  that directly implicate Nevada's sovereign interest in administering its own system of government.

10  In particular, because these claims directly implicate the legislative branch's inherent powers of

11  institutional self-protection and self-preservation as a coequal department of state government, the

12  legislative branch has a compelling interest in ensuring that the Nevada Supreme Court—as the

13  final interpreter of the meaning of the Nevada Constitution—serves as the proper forum for

14  deciding these important state-law issues of first impression. Moreover, to resolve these claims on

15  the merits, this Court would need to interpret state-specific constitutional provisions with no

16  federal counterpart. Because there are no reported cases from the Nevada Supreme Court directly

17  on point to provide guidance on how to resolve these claims on the merits, this Court would need

18  to develop new state constitutional standards and predict how the Nevada Supreme Court would

19  decide the constitutional issues.  See Eichacker v. Paul Revere Life Ins. Co., 354 F.3d 1142, 1145

20  (9th Cir. 2004); Ins. Co. of N. Am. v. Hilton Hotels, 908 F.Supp. 809, 814 (D. Nev. 1995).

21  Because federal courts generally do not provide the best forum for resolving such novel, complex

22  and policy-laden issues of state constitutional law, this Court should not exercise supplemental

23  jurisdiction over these state constitutional claims. For that reason, Plaintiffs' motion for

24  preliminary injunction should be denied with regard to their state constitutional claims under

Article 1, Section 1 and Article 4, Section 15 of the Nevada Constitution.

**V.   Plaintiffs have failed, as a matter of law, to meet their heavy burden to prove that they are entitled to a preliminary injunction because they have not proven that: (1) they are likely to succeed on the merits of their claims; (2) they are likely to suffer irreparable harm without the injunction; (3) the balance of equities tips in their favor; or (4) the issuance of the injunction is in the public interest.**

A preliminary injunction is an "extraordinary and drastic remedy" that is "never awarded as of right." Munaf v. Geren, 553 U.S. 674, 689-90 (2008). To be granted a preliminary injunction, Plaintiffs must establish that: (1) they are likely to succeed on the merits of their claims; (2) they are likely to suffer irreparable harm without the injunction; (3) the balance of equities tips in their favor; and (4) the issuance of the injunction is in the public interest. Winter v. Nat. Res. Def. Council, 555 U.S. 7, 20 (2008). In most cases seeking preliminary injunctive relief, courts "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." Amoco Prod. Co. v. Vill. of Gambell, 480 U.S. 531, 542 (1987). However, when parties seek to enjoin governmental action that serves to protect the public interest, "courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." Weinberger v. Romero-Barcelo, 456 U.S. 305, 312 (1982). Under such circumstances, "where an injunction is asked which will adversely affect a public interest for whose impairment, even temporarily, an injunction bond cannot compensate, the court may in the public interest withhold relief until a final determination of the rights of the parties, though the postponement may be burdensome to the plaintiff." Yakus v. United States, 321 U.S. 414, 440 (1944).

Consequently, Plaintiffs must meet a heavy burden to prove that they are entitled to preliminary injunctive relief because "the need to show 'substantial and immediate irreparable injury' is especially strong when plaintiffs seek to enjoin the activity of a state or local government." Int'l Franchise Ass'n v. City of Seattle, 97 F.Supp.3d 1256, 1285 (W.D. Wash.

2015) (quoting <u>Hodgers-Durgin v. de la Vina</u>, 199 F.3d 1037, 1042 (9th Cir. 1999)), *aff'd*, 803

F.3d 389 (9th Cir. 2015), *cert. denied*, 136 S. Ct. 1838 (2016). As stated by the Ninth Circuit,

"[t]he Supreme Court has repeatedly cautioned that, absent a threat of immediate and irreparable

harm, the federal courts should not enjoin a state to conduct its business in a particular way."

<u>Hodgers-Durgin</u>, 199 F.3d at 1042. Therefore, to meet their heavy burden, Plaintiffs may not rely

on a mere possibility of irreparable harm because "[i]ssuing a preliminary injunction based only

on a possibility of irreparable harm is inconsistent with our characterization of injunctive relief as

an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is

entitled to such relief." <u>Winter</u>, 555 U.S. at 22.

    **A.   Plaintiffs have not proven that they are likely to succeed on the merits of their claims under the First Amendment and Article 1, Sections 9 and 10 of the Nevada Constitution.**

    Plaintiffs contend that they have rights under the Free Speech and Petition Clauses of the

First Amendment to be granted in-person access to the Building so they may physically attend

legislative sessions and lobby legislators and staff in person within the Building. (ECF No. 6 at

22-29.) Plaintiffs also contend that any governmental restrictions on their alleged rights must

satisfy strict scrutiny in order to withstand constitutional review. (ECF No. 6 at 25-29.) Plaintiffs

are wrong as a matter of law.[4]

    The Supreme Court has held that "the First Amendment does not guarantee access to

property simply because it is owned or controlled by the government." <u>U.S. Postal Serv. v.

Council of Greenburgh Civic Ass'ns</u>, 453 U.S. 114, 129 (1981). Instead, "[t]he State, no less than

a private owner of property, has power to preserve the property under its control for the use to

---

[4] As discussed previously, the Nevada Supreme Court has ruled that the rights protected by Article 1, Sections 9 and 10 of the Nevada Constitution are coextensive with the rights protected by the First Amendment. <u>Deja Vu Showgirls</u>, 334 P.3d at 398 n.7. Therefore, this discussion applies equally to the rights protected by Article 1, Sections 9 and 10.

1    which it is lawfully dedicated." <u>Adderley v. Florida</u>, 385 U.S. 39, 47 (1966). The State's power

2    over its property includes the power to impose "reasonable time, place, or manner regulations

3    [that] normally have the purpose and direct effect of limiting expression but are nevertheless

4    valid." <u>Clark v. Cmty. for Creative Non-Violence</u>, 468 U.S. 288, 294 (1984).

5          With regard to legislative lobbying, the Supreme Court has recognized that such lobbying

6    implicates "the freedoms guaranteed by the First Amendment—freedom to speak, publish, and

7    petition the Government." <u>United States v. Harriss</u>, 347 U.S. 612, 625 (1954). However, the

8    Supreme Court also has recognized that such lobbying is not constitutionally exempt from

9    regulation by the legislative branch, especially when such regulation is necessary to ensure the

10   legislative branch's "power of self-protection." <u>Id.</u> Furthermore, the Supreme Court has never

11   recognized a First Amendment right that requires the legislative branch to grant lobbyists or the

12   public in-person access to legislative buildings so they may physically attend legislative sessions

13   and lobby legislators and staff in person within those buildings. To the contrary, lobbyists and the

14   public ordinarily do not have any federal constitutional rights to physically attend legislative

15   sessions or participate—in person or otherwise—in proceedings of legislative bodies. <u>See</u> <u>Nev.</u>

16   <u>Comm'n on Ethics v. Carrigan</u>, 564 U.S. 117, 121 (2011) ("Legislative sessions would become

17   massive town-hall meetings if those who had a right to speak were not limited to those who had a

18   right to vote."); <u>Bi-Metallic Inv. Co. v. State Bd. of Equal.</u>, 239 U.S. 441, 445-46 (1915) ("The

19   Constitution does not require all public acts to be done in town meeting or an assembly of the

20   whole."); <u>Mayhew v. Wilder</u>, 46 S.W.3d 760, 776 (Tenn. Ct. App. 2001) ("[T]here are no United

21   States Supreme Court cases recognizing a First Amendment right of access to state legislative

22   meetings."); <u>Hughes v. Speaker of N.H. House of Reps.</u>, 876 A.2d 736, 747 (N.H. 2005) ("The

23   United States Supreme Court has not yet recognized a federal constitutional or common law right

24   to attend legislative sessions.").

1     In attempting to craft never-before-recognized rights, Plaintiffs mistakenly rely on the test

2     applied to governmental restrictions imposed on the exercise of First Amendments rights in

3     traditional public forums, such as public parks and streets. See, e.g., Index Newspapers v. U.S.

4     Marshals Serv., 977 F.3d 817, 829-30 (9th Cir. 2020). However, the Supreme Court has never

5     held that legislative buildings are traditional public forums. This is not surprising because the

6     Supreme Court's interpretation of the First Amendment is guided by the long-established

7     traditions that were in place when the First Amendment was framed and ratified, including long-

8     established rules of parliamentary practice governing legislative assemblies. Nev. Comm'n on

9     Ethics, 564 U.S. at 122-25.

10    Under those long-established rules of parliamentary practice, each legislative assembly "has

11    the absolute control of the place of its sitting, and may exclude therefrom, at its pleasure, all

12    strangers, that is, all persons who are not its members." Luther S. Cushing, Elements of the Law &

13    Practice of Legislative Assemblies § 343 (1856). For example, "[i]n both branches of parliament,

14    the proceedings were conducted with closed doors from the earliest times." Cushing § 345. This

15    long-established practice was followed in colonial legislative assemblies and in state legislatures

16    and Congress during the period when the First Amendment was framed and ratified. Cushing

17    § 346. Thus, at the time, it was a long-established practice that legislative assemblies were free to

18    hold secret sessions because "it is one of their essential privileges to be secret in their proceedings

19    and debates, and, therefore, to exclude all strangers from witnessing them." Cushing § 623.

20    Accordingly, based on long-established parliamentary practice, legislative buildings are not

21    treated as traditional public forums. As a result, any governmental restrictions on the exercise of

22    First Amendment rights in legislative buildings are not subject to strict scrutiny. See Reza v.

23    Pearce, 806 F.3d 497, 502-03 (9th Cir. 2015) (holding that Arizona Senate Building was not a

24    traditional public forum). Therefore, contrary to Plaintiffs' contentions, Director Erdoes' decisions

-22-

to control access to the Building are not required to satisfy strict scrutiny in order to withstand constitutional review. Instead, Director Erdoes' decisions to control access to the Building are subject to review under the standards for content-neutral regulation of the time, place and manner of engaging in protected expression under the First Amendment.

In any type of forum, the government may regulate the time, place and manner of engaging in protected expression if the regulation is: (1) unrelated to the content of the protected expression; (2) supported by a significant governmental interest; and (3) narrowly tailored to serve the government's interest so that "ample alternative channels for communication" remain open for the protected expression. Ward v. Rock Against Racism, 491 U.S. 781, 791 (1989); Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n, 460 U.S. 37, 46 (1983). The government may enforce such time, place and manner restrictions in legislative buildings. See Nev. Comm'n on Ethics, 564 U.S. at 121-22; Reza, 806 F.3d at 502-03.

In this case, Director Erdoes' decisions to control access to the Building are unrelated to the content of the protected expression of any lobbyists or members of the public. Her decisions are also supported by several substantial governmental interests in ensuring that the government's operations are efficient and effective and that the government protects the public's health, safety and welfare. First, "[t]he government has a substantial interest in ensuring that all of its operations are efficient and effective." Borough of Duryea, Pa. v. Guarnieri, 564 U.S. 379, 386-87 (2011). Second, the government has a substantial interest in safeguarding within its government buildings the health, safety and welfare of both the general public and its government employees, especially during periods of heightened danger. See Lavite v. Dunstan, 932 F.3d 1020, 1030 (7th Cir. 2019); United States v. Bulacan, 156 F.3d 963, 967-68 (9th Cir. 1998); McMorris v. Alioto, 567 F.2d 897, 899-900 (9th Cir. 1978); Downing v. Kunzig, 454 F.2d 1230, 1232-33 (6th Cir. 1972). Third, the government has "a significant interest in ensuring that the General Assembly, whether sitting

-23-

in a session, meeting, proceeding or committee, has the opportunity to fulfill its mandate free from objectively unreasonable interferences." State v. Linares, 655 A.2d 737, 750 (Conn. 1995). Fourth, the government has a substantial interest in protecting "the public health and the public safety when endangered by epidemics of disease." Jacobson v. Massachusetts, 197 U.S. 11, 37 (1905). As a result, the government has broad power to take all protective and safety measures that are deemed necessary for "the protection of the public health and the public safety, confessedly endangered by the presence of a dangerous disease." Id. at 39. The reason for this broad power is that "[u]pon the principle of self-defense, of paramount necessity, a community has the right to protect itself against an epidemic of disease which threatens the safety of its members." Id. at 27.

Finally, Director Erdoes' decisions to control access to the Building are narrowly tailored to serve the government's interests so that ample alternative channels for communication remain open for the protected expression of any lobbyists or members of the public. Specifically, such persons have several alternative channels of communication to access, observe and participate in legislative proceedings via telephone, videoconference and virtual meetings. (Legis. Defs.' Ex. 2 at 001.) Such persons also are allowed to enter the Building after making an appointment and complying with the health-and-safety protocols. (Legis. Defs.' Ex. 3 at 001.) Under such circumstances, Director Erdoes' decisions are valid content-neutral time, place and manner regulations. Therefore, Plaintiffs are not likely to succeed on the merits of their claims under the First Amendment and Article 1, Sections 9 and 10 of the Nevada Constitution.

**B. Plaintiffs have not proven that they are likely to succeed on the merits of their claims under the Due Process Clause of the Fifth and Fourteenth Amendments.**

Plaintiffs contend that Director Erdoes' decisions to control access to the Building violate their rights to substantive and procedural due process under the Fifth and Fourteenth Amendments. (ECF No. 6 at 22-25.) Plaintiffs are wrong as a matter of law. Under the Federal

Constitution, "[t]he Due Process Clause of the Fifth Amendment and the equal protection component thereof apply only to actions of the federal government—not to those of state or local governments." Lee v. City of Los Angeles, 250 F.3d 668, 687 (9th Cir. 2001). Therefore, the Due Process Clause of the Fifth Amendment is not applicable to this case.

The Due Process Clause of the Fourteenth Amendment applies to state governments. However, the Supreme Court has rejected the argument that the procedural protections of the Due Process Clause give individuals procedural rights to notice and an opportunity to be heard in legislative proceedings. Bi-Metallic Inv., 239 U.S. at 445-46. By contrast, the Due Process Clause may give individuals procedural rights to notice and an opportunity to be heard in adjudicative proceedings, but this case does not involve any adjudicative proceedings. Instead, Director Erdoes' decisions to control access to the Building are regulatory decisions involving content-neutral time, place and manner regulations of general applicability that govern all lobbyists and members of the public. Director Erdoes' decisions are not adjudicative decisions made in adjudicative proceedings in which the rights of individuals are adjudicated before neutral decision-makers. Therefore, the procedural protections of the Due Process Clause do not apply to this case.

Finally, the substantive protections of the Due Process Clause do not apply to this case because Plaintiffs' claims are governed by the First Amendment. Hufford v. McEnaney, 249 F.3d 1142, 1151 (9th Cir. 2001). When claims are governed by an explicit textual source of rights in the Federal Constitution such as the First Amendment, this Court "should not resort to the more subjective standard of substantive due process." LaVelle v. City of Las Vegas, 447 F.Supp.3d 1015, 1026 (D. Nev. 2020). Consequently, because Plaintiffs' claims are explicitly covered by the First Amendment, the Fourteenth Amendment's guarantee of substantive due process is not applicable to this case. Id. For all these reasons, Plaintiffs are not likely to succeed on the merits of their claims under the Due Process Clause of the Fifth and Fourteenth Amendments.

**C.   Plaintiffs have not proven that they are likely to succeed on the merits of their claims under Article 1, Section 1 of the Nevada Constitution.**

Plaintiffs contend that Director Erdoes' decisions to control access to the Building violate their rights under Article 1, Section 1 of the Nevada Constitution. (ECF No. 6 at 28-29.) The state constitutional provision provides:

> All men are by Nature free and equal and have certain inalienable rights among which are those of enjoying and defending life and liberty; Acquiring, Possessing and Protecting property and pursuing and obtaining safety and happiness.

First, this Court should reject these state constitutional claims because Plaintiffs do not provide any cogent analysis or citation to relevant authority to support their claims. Rogers v. State, 705 P.2d 664, 669-70 (Nev. 1985). Second, this Court should reject these state constitutional claims because in interpreting Article 1, Section 1, the Nevada Supreme Court has determined that "all occupations are subject to necessary or reasonable regulations and restrictions for the prevention of injury to others." Marymont v. Nev. State Banking Bd., 111 P. 295, 296 (Nev. 1910). In this case, Director Erdoes' decisions to control access to the Building are necessary and reasonable regulations and restrictions for the prevention of injury to others because they keep the legislative process as safe and free as reasonably possible from the extraordinary danger, risk, harm, injury and peril posed by the pandemic. Therefore, Plaintiffs are not likely to succeed on the merits of their claims under Article 1, Section 1 of the Nevada Constitution.

**D.   Plaintiffs have not proven that they are likely to succeed on the merits of their claims under Article 4, Section 15 of the Nevada Constitution.**

Plaintiffs contend that Director Erdoes' decisions to control access to the Building violate their rights under Article 4, Section 15 of the Nevada Constitution. (ECF No. 6 at 29-30.) The state constitutional provision provides in relevant part:

The doors of each House shall be kept open during its session[.] . . . The meetings of all legislative committees must be open to the public, except meetings held to consider the character, alleged misconduct, professional competence, or physical or mental health of a person.

First, this Court should reject these state constitutional claims because Plaintiffs do not provide any cogent analysis or citation to relevant authority to support their claims. Second, this Court should reject these state constitutional claims because Director Erdoes' decisions comport with the requirement that legislative floor sessions and committee meetings must be "open" to the public under Article 4, Section 15, as explained in the legal opinion provided to the Director by LCB Legal. (Legis. Defs.' Ex. 1 at 007-17.) Under Nevada law, the legislative branch may rely on an opinion of its counsel which interprets a constitutional provision, and the legislative branch "is entitled to deference in its counseled selection of this interpretation." Nev. Mining Ass'n v. Erdoes, 26 P.3d 753, 758 (Nev. 2001).

In Nevada's constitutional proceedings concerning Article 4, Section 15, the framers debated the merits of the Houses being able to hold "secret sessions" as authorized under long-established rules of parliamentary law. Debates & Proceedings of the Nevada State Constitutional Convention of 1864, at 142-43 (Andrew J. Marsh off. rep. 1866). Based on the debate of the framers, they wanted to ensure that the legislative floor sessions of each House were "open" so that the public and the members of the other House had "full knowledge" of those proceedings. Id. Except for the original carve-out allowing the Senate to hold a secret "executive session" to approve appointments to office, the framers did not want to give either House "the right to transact any public business whatever, without the people knowing what it is." Id. Thus, for most legislative business, the intent of the framers was to reject the rule of parliamentary law that allowed for secret legislative floor sessions. Instead, the framers mandated that legislative floor sessions must be "open" to ensure that neither House "shall have the power of doing what their

constituency or the other branch of the Legislature have not the privilege of knowing." Id.

Given the intent of the framers as expressed in their debate, their overriding concern was to ensure that the public was not deprived of full knowledge of the legislative business transacted during legislative floor sessions. Accordingly, it is both reasonable and consistent with the intent of the framers to interpret the term "open" in Article 4, Section 15 to mean that legislative floor sessions must not be concealed to the public's view and scrutiny but must be exposed to the public's view and scrutiny and must be carried on without concealment. As a result, so long as the public is given the opportunity to observe the legislative floor sessions and gain full knowledge of those proceedings without being physically present in the Building, the intent of the framers has been fully realized. This conclusion regarding the intent of the framers is further supported by the legislative history that led to the 1994 amendment of Article 4, Section 15, which removed the original carve-out allowing the Senate to meet in secret "executive session" to approve appointments to office and which added the clause that the meetings of all legislative committees must be "open" to the public, with certain exceptions.

The legislators who drafted the amendment to Article 4, Section 15 governing "open" legislative committee meetings wanted to ensure that such committee meetings are conducted openly in "the public eye" where legislative business will be exposed to the public's view and scrutiny, and that such committee meetings are not conducted secretly in "private" where legislative business will be concealed to the public's view and scrutiny, unless the meetings qualify for the exception. Legislative History of S.J.R. 7, 66th Leg. (Nev. LCB Research Library 1991).[5] This legislative intent is also reflected in the ballot materials presented to the voters at the 1994 general election, which stated in the arguments for passage that "[i]t is in the best interests of

---

[5] Available at:
https://www.leg.state.nv.us/Division/Research/Library/LegHistory/LHs/1991/SJR07,1991_1993.pdf.

Nevada and its citizens that meetings of legislative committees be open to public scrutiny." <u>Nev. Ballot Questions 1994, Question No. 2</u>, at 1 (Nev. Sec'y of State 1994). In addition to such "public scrutiny," the legislators also wanted to ensure that "the public will have input" at such committee meetings. <u>Legislative History of S.J.R. 7</u>, <u>supra</u>.

Given the intent of the legislators who drafted the amendment to Article 4, Section 15, their overriding concern was to ensure that the public was not deprived of full knowledge of the legislative business transacted during legislative committee meetings and was given the opportunity to provide input for such committee meetings. Accordingly, it is both reasonable and consistent with that intent to interpret the term "open" in Article 4, Section 15 to mean that legislative committee meetings must not be concealed to the public's view and scrutiny but must be exposed to the public's view and scrutiny and must be carried on without concealment. As a result, so long as the public is given the opportunity to view legislative committee meetings to gain full knowledge of those proceedings and is also given the opportunity to provide input for such committee meetings without being physically present in the Building, the intent of the amendment to Article 4, Section 15 has been fully realized.

In this case, Director Erdoes' decisions comport with the requirement that legislative floor sessions and committee meetings must be "open" to the public under Article 4, Section 15, because the Director has enabled reasonable alternative means of communication which provide the public with the opportunity to observe the legislative floor sessions and committee meetings and communicate with Legislators without being physically present in the Building. Under such circumstances, the legislative branch has relied on an opinion of its counsel which interprets the constitutional provision, and the legislative branch "is entitled to deference in its counseled selection of this interpretation." <u>Nev. Mining</u>, 26 P.3d at 758. Therefore, Plaintiffs are not likely to succeed on the merits of their claims under Article 4, Section 15 of the Nevada Constitution.

**E.   Plaintiffs have not proven that they are likely to suffer irreparable harm without the injunction, that the balance of equities tips in their favor or that the issuance of the injunction is in the public interest.**

In this case, Plaintiffs have not proven that the balance of equities tips in their favor or that the issuance of the injunction is in the public interest. To the contrary, the public interest in keeping the legislative process as safe and free as reasonably possible from the extraordinary danger, risk, harm, injury and peril posed by the pandemic greatly outweighs Plaintiffs' interest in having in-person access to the Building so they may physically attend legislative sessions and lobby legislators and staff in person within the Building, especially since lobbyists and members of the public have several alternative channels of communication available to them.

Plaintiffs also have not proven that they are likely to suffer irreparable harm without the injunction because Director Erdoes' decisions to control access to the Building are narrowly tailored to serve the public interest and ensure that the alternative channels for communication remain open for lobbyists and members of the public. Specifically, such persons may access, observe and participate in legislative proceedings via telephone, videoconference and virtual meetings. (Legis. Defs.' Ex. 2 at 001.) Such persons also may enter the Building after making an appointment and complying with the health-and-safety protocols. (Legis. Defs.' Ex. 3 at 001.) Under such circumstances, "absent a threat of immediate and irreparable harm, the federal courts should not enjoin a state to conduct its business in a particular way." Hodgers-Durgin, 199 F.3d at 1042. Therefore, Plaintiffs have failed, as a matter of law, to meet their heavy burden to prove that they are entitled to a preliminary injunction.

### **CONCLUSION**

Based on the foregoing, Legislative Defendants ask this Court to deny Plaintiffs' Motion for Preliminary Injunction (ECF No. 6).

//

-30-

DATED:   This __26th__ day of April, 2021.

            Respectfully submitted,

By:   /s/  Kevin C. Powers
        **KEVIN C. POWERS**, General Counsel
        Nevada State Bar No. 6781
        NEVADA LEGISLATIVE COUNSEL BUREAU, LEGAL DIVISION
        401 S. Carson St.
        Carson City, NV 89701
        Tel: (775) 684-6830; Fax: (775) 684-6761
        Email: kpowers@lcb.state.nv.us
        *Attorneys for Legislative Defendants Brenda J. Erdoes, in her official capacity as Director of the Legislative Counsel Bureau of the State of Nevada, and Nicole J. Cannizzaro, in her official capacity as Chair of the Legislative Commission of the State of Nevada*

## CERTIFICATE OF SERVICE

I hereby certify that I am an employee of the Nevada Legislative Counsel Bureau, Legal Division, and that on the __26th__ day of April, 2021, pursuant to FRCP 5(b) and LR Part IC, I filed and served a true and correct copy of Legislative Defendants' Response in Opposition to Plaintiffs' Motion for Preliminary Injunction (ECF No. 6), by using the Court's CM/ECF system for electronic service directed to the following:

**SIGAL CHATTAH, ESQ.**
CHATTAH LAW GROUP
5875 S. Rainbow Blvd. #203
Las Vegas, NV 89118
Chattahlaw@gmail.com
*Attorneys for Plaintiffs*


/s/  Kevin C. Powers
An Employee of the Legislative Counsel Bureau