**RESP**
SIGAL CHATTAH, ESQ.
NV Bar No.: 8264
CHATTAH LAW GROUP
5875 S. Rainbow Blvd. #204
Las Vegas, Nevada 89101
(702) 360-6200
(702) 643-6292
Chattahlaw@gmail.com
Attorney for Plaintiffs

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

SHAWN MEEHAN, an individual, JANINE HANSEN, and individual, LYNN CHAPMAN, an individual, MELISSA CLEMENT, an individual,

        Plaintiffs,

        vs.

STEPHEN F. SISOLAK, in his official capacity as Governor of the State of Nevada, AARON DARNELL FORD, in his official capacity as the Attorney General of the State of Nevada, BRENDA ERDOES, in her official capacity as Head of Legislative Counsel Bureau, NICOLE CANNIZZARO, in her official capacity as Chair of the Legislative Commission, DOES 1 through 100.

        Defendants.

**Case No: 2:21-cv-00100 MMD-WGC**

**PLAINTIFFS' RESPONSE TO MOTION TO DISMISS**

## <u>PLAINTIFF SHAWN MEEHAN ET AL'S RESPONSE TO THE LEGISLATIVE DEFENDANTS' MOTION TO DISMISS</u>

COMES NOW, Plaintiffs SHAWN MEEHAN ET AL by and through the undersigned attorney of record, SIGAL CHATTAH, ESQ., of CHATTAH LAW GROUP, who hereby submit the following RESPONSE TO LEGISLATIVE DEFENDANTS' MOTION TO DISMISS.

**INTRODUCTION**

On February 1, 2021, the 120 day, 81st Legislative Session commenced in the State of Nevada. Defendants refused to open the Legislative Building and allow public access to same to testify in person and precluding Plaintiffs from lobbying their Legislative officials and bills. Plaintiffs are lobbyists that were precluded from having access to the Legislative building as delineated in detail *infra*.

**PROCEDURAL POSTURE**

On February 26, 2021, a Complaint in the matter *sub judice* was filed and an Emergency Motion for Preliminary Injunction was filed hereon. On April 26, 2021, Defendants filed their Answer to the Complaint [ECF 31].

On the same day Defendants filed their Response to Plaintiff's Motion for Preliminary Injunction [ECF 30] delineating the reasons why this Court should deny the Motion as Moot. Plaintiffs' Reply Brief [ECF 33] conceded to the mootness of the Motion following Defendants' reopening of the Legislative Building on April 15, 2021 and instructed the Court to vacate the hearing thereon.

Defendants bring this Motion to Dismiss under Fed. R. Civ. Pro. 12(h)(3) alleging absolute immunity precluding this Court's jurisdiction on the matter and a determination on the merits of same.

**STATEMENT OF FACTS**

The Complaint on file herein includes the following claims for relief:

1.    VIOLATION OF THE FIFTH AMENDMENT Due Process as enforced by 42 § 1983.

**2.**    VIOLATION OF THE DUE PROCESS CLAUSE OF THE FOURTEENTH AMENDMENT

3.      VIOLATION OF THE FREE SPEECH AND PETITION THE
        GOVERNMENT CLAUSES OF THE FIRST AMENDMENT

4.      VIOLATION OF THE NEVADA CONSTITUTION ARTICLE I
        DECLARATION OF RIGHTS

5.      VIOLATION OF NEVADA CONSTITUTION Article 4 Sec. 15

6.      DECLARATORY RELIEF

Article 4, §15, of the Nevada Constitution provides "[T]he doors of each House shall be kept open during its session, and neither shall, without the consent of the other, adjourn for more than three days nor to any other place than that in which they may be holding their sessions. The meetings of all legislative committees must be open to the public, except meetings held to consider the character, alleged misconduct, professional competence, or physical or mental health of a person." In addition to violating Plaintiffs' 1st, 4th, 5[th and] 14th Amendment rights, Defendants also violated Article 4 §15 of the Nevada Constitution by denying access to Plaintiffs by the closure of the Legislative Building to Plaintiffs and the public.

### DEFENDANTS' ALLEGATIONS

Defendants cloak their Motion to Dismiss with fatal misinterpretations of immunity and their obligations under both the United States and Nevada Constitutions. Among Defendants' allegations there are:

- NRS 331.070, 331.120, 331.130, 331.133, 331.135. By contrast, the Legislature has given the state legislative branch the statutory authority to supervise and control the Legislative Building ("Building") and the grounds surrounding the Building during and between legislative sessions. NRS 331.135. The Legislature has assigned that statutory authority to Director Erdoes as the executive head of the LCB. NRS 218F.110(1), 218F.300(1), 218F.500(2), 218F.520(1). See [ECF 30, pg 1]

- As part of their statutory powers and duties, the LCB's divisions provide all legal, fiscal, research, audit, administrative, technical and other services necessary to the efficient and effective operation of the Legislature. NRS Title 17 (State Legislative Department). For example, the LCB is required to provide "[a]ll administrative services necessary to the operation of the Legislature during and between regular and special sessions." NRS 218F.300(1). To carry out the supervision and control of the Building and the grounds surrounding the Building during and between legislative sessions, the Legislature has made the LCB responsible for "[s]ecurity" and has invested the LCB with the statutory authority to "preserve order and security" within the Building and on the grounds surrounding the Building. NRS 218F.500(2)(i), 218F.520(1). Thus, as the executive head of the LCB, Director Erdoes has the statutory authority and responsibility to ensure that the LCB is able to fulfill its statutory mission to: (1) protect the public's health, safety and welfare within the Building and on the grounds surrounding the Building; and (2) provide all services necessary to the efficient and effective operation of the Legislature. NRS Title 17. *Id. at pg. 2.*

- The legal opinion was released publicly, and the media published the legal opinion on publicly accessible websites. In the legal opinion, LCB Legal advised Director Erdoes regarding the following issues: widespread public-health crisis caused by the pandemic.)

- In the legal opinion, LCB Legal advised Director Erdoes regarding the following issues:

After considering the plain meaning of the statutory language in NRS Title 17 the Director—as the executive head of the LCB—the statutory authority to "preserve order and security "within the Legislative Building during a legislative session, and after interpreting that statutory language in line with what reason and public policy would indicate the Legislature intended, it is the opinion of this office that the Legislature's grant of statutory authority to the Director under NRS Title 17allows the Director to restrict or prohibit the public from entering the Legislative Building during a legislative session in order to protect the public's health, safety and welfare and provide all services necessary to the efficient and effective operation of the Legislature amid the ongoing and widespread public-health crisis caused by the COVID-19 pandemic.

Finally, if the Director exercises the statutory authority granted by the Legislature under NRS Title 17 to restrict or prohibit the public from entering the Legislative…

- On Jan. 21, 2021, Director Erdoes issued a press release explaining how the Legislature would operate initially within the Building during the 81st session beginning on Feb. 1, 2021. (Legis. Defs.' Ex. 2.) Director Erdoes explained that the Building would be closed to all persons other than legislators, essential staff and a small news media pool. (Legis. Defs.' Ex. 2 at 001.)

- Finally, Director Erdoes explained that after legislators and essential staff received both doses of the COVID-19 vaccination, the Legislature would initiate a plan to begin reopening the Building to lobbyists and the public under certain health-and-safety protocols:

## LEGAL ARGUMENT

### A.   STANDING AND FEDERAL QUESTION

In *Lujan* v. *Defenders of Wildlife, 504 U. S. 555, 560-561 (1992)*, the USSC held that, to satisfy Article Ill's standing requirements, a plaintiff must show (1) it has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. *Id.*

Article III of the Constitution limits federal courts to deciding "Cases" and "Controversies," and "an actual controversy must exist not only at the time the complaint is filed, but through all stages of the litigation." *Already, LLC v. Nike, Inc., 568 U. S. ___, ___ (2013) (slip op., at 3–4) (internal quotation marks omitted).*

5

Here, Defendants allege that no live controversy in the ordinary sense remains because no court is now capable of granting the relief Plaintiffs seek. Although a case would generally be moot in such circumstances, the 9th Circuit Court's precedents recognize an exception to the mootness doctrine for a controversy that is "'capable of repetition, yet evading review.'" *Spencer v. Kemna, 523 U. S. 1, 17 (1998).*

That exception applies "only in exceptional situations," where (1) "the challenged action [is] in its duration too short to be fully litigated prior to cessation or expiration," and (2) "there [is] a reasonable expectation that the same complaining party [will] be subject to the same action again." *Ibid. (internal quotation marks omitted; brackets in original).*

**B.    THE MATTER *SUB JUDICE* IS NOT MOOT**

A party's "voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice" if the challenged practice is "reasonably . . . expected to recur." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, *528 U.S. 167, 189 (2000) (internal quotations and citations omitted).*

If it did, courts would be compelled to leave the Defendants free to return to their old ways. Thus, the standard for determining whether a case has been mooted by the Defendants' voluntary conduct is stringent: A case might become moot if subsequent events make it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur. *United States* v. *Concentrated Phosphate Export Assn., Inc., 393 U. S. 199, 203(1968).* The heavy burden of persuading the court that the challenged conduct cannot reasonably be expected to recur lies with the party asserting mootness. *Ibid.*

The question for determination is whether Defendants' voluntary conduct is capable of repetition. *Los Angeles* v. *Lyons, 461 U. S. 95 (1983).* Could Plaintiffs herein credibly allege that

Defendants conduct could recur. That is the analysis that this Court must make as to how likely would there be a recurrence of this unlawful conduct.

Here, as stated in both the Complaint and in Plaintiffs' Emergency Petition for Preliminary Injunction, this was the third consecutive session that the Legislative Building was closed to the public. Therefore, not only were these violations repeated multiple times in the past year, this unconstitutional conduct, is clearly capable of being repeated in the future.

Furthermore, a court may exercise jurisdiction over cases that are "capable of repetition, yet evading review." *Kingdomware Techs., Inc. v. United States*, *136 S. Ct. 1969, 1976 (2016).* An examination of whether the matter *sub judice* is moot requires a two-step analysis. First is the issue moot as to Plaintiffs; Second is the issue moot as to Defendants' actions.

In *Dunn v. Blumstein, 405 U.S. 330, 33 (1972)* the Tennessee voting registration case, the Court permitted a plaintiff with a moot personal stake to proceed based on the importance of the issue to the general public. Here, Plaintiffs allege that there are no guarantees that this will not recur, especially since this is the third consecutive session that was held in violation of Plaintiffs' constitutional rights.

In *Grossberg v. Deusebio, 380 F. Supp. 285, 292 (E.D. Va. 1974),* the court held that a claim by high school students and their parents seeking injunction against a religious component of a graduation ceremony was not rendered moot by the students' graduation, even though plaintiffs "will never again be susceptible to the conduct of which they complained." *Id*. Hearing plaintiffs' claim was appropriate, the court explained, because it "[was] the only effective means to insure full and deliberate adjudication of the Establishment [Clause] issues they raise." *Id.*

The Supreme Court has generally declined to deem cases moot that present issues or disputes that are capable of repetition, yet evading review.[1] This exception to the mootness doctrine applies only in exceptional situations[2] in which (1) the challenged action is in its duration too short to be fully litigated prior to cessation or expiration; and (2) there is a reasonable expectation that the same complaining party will be subject to the same action again.[3] According to the Supreme Court, if this exception to mootness did not exist, then certain types of time-sensitive controversies would become effectively unreviewable by the courts.

In *Roe v Wade*, which reviewed a woman's constitutional challenge to an abortion regulation, the Court deemed that once a woman gives birth, abortion is no longer an option for terminating that particular pregnancy. However, litigation of national political significance can rarely be fully resolved in a mere nine months Because the Supreme Court has decided that our law should not be that rigid, the Court ruled in its 1973 opinion in *Roe v. Wade* that pregnancy provides a classic justification for a conclusion of nonmootness. [4]

The *Roe* Court reasoned that, because pregnancy often comes more than once to the same woman, and . . . if man is to survive, it will always be with us, challenges to the constitutionality of abortion statutes usually will not become moot at the conclusion of an individual challenger's pregnancy.

---

[1]  *Kingdomware Techs., Inc. v. United States,* 136 S. Ct. 1969, 1976 (2016); Turner v. Rogers, 564 U.S. 431, 439–41 (2011); Davis v. FEC, 554 U.S. 724, 735–36 (2008); FEC v. Wis. Right to Life, Inc., 551 U.S. 449, 462 (2007); Norman v. Reed, 502 U.S. 279, 287–88 (1992); Int'l Org. of Masters, Mates & Pilots v. Brown, 498 U.S. 466, 473 (1991) Spencer v. Kemna, 523 U.S. 1, 17–18 (1998)
[2]  *Kingdomware Techs.,* 136 S. Ct. at 1976 (quoting Spencer, 523 U.S. at 17)
[3]. United States v. Juvenile Male, 564 U.S. 932, 938 (2011) (quoting Spencer, 523 U.S. at 17). See also, e.g., Sanchez-Gomez, 138 S. Ct. at 1540; Kingdomware Techs., 136 S. Ct. at 1976.
[4]  *Roe v. Wade,* 410 U.S. 113, 125 (1973)

The Supreme Court has deemed certain controversies capable of repetition, yet evading review outside the abortion context as well.[5] For example, in *Federal Election Commission v. Wisconsin Right to Life, Inc.*, an advocacy organization claimed that restrictions on electioneering communications established by the Bipartisan Campaign Reform Act of 2002 unconstitutionally prohibited the organization from broadcasting certain political advertisements shortly before the 2004 election. Even though the case did not reach the Supreme Court until long after the 2004 election had passed, the Court nonetheless concluded that the case was not moot.

The Court reasoned that the organization credibly claimed that it planned on running 'materially similar' future targeted broadcast ads in advance of future elections, and the period between elections was too short to allow the organization sufficient time to fully litigate its constitutional challenges sufficiently in advance of the election date.[6]

It is clear that on the basis of another pandemic, even if this inherently short-lived claim is unlikely to recur as to Plaintiffs, it is likely, or even certain, to recur as to other Plaintiffs as it affects all lobbyists and the public alike. This exception to the mootness doctrine is found in prudential consideration that if Plaintiffs do not necessarily suffer a recurrence of a like-kind Legislative Directive by Defendants or successors of Defendants it is certain that other individuals will.

Because this combination of events is ordinarily both highly speculative and exceedingly unlikely to occur, courts are unable to find a "reasonable likelihood" that the challenged conduct

---

[5] *See FN 1*
[6] *Federal Election Commission v. Wisconsin Right to Life, Inc.*, 551 U.S. 449, 168 L. Ed. 2d 329, 127 S. Ct. 2652 (2007)

will recur as to the same plaintiff. [7] One would therefore expect courts to find the capable-of-repetition exception inapplicable, and to dismiss the claim as moot. And yet quite frequently, the result is just the opposite: in cases where the prudential factors line up in favor of hearing the case, frequently courts will simply relax the same-plaintiff requirement and apply the capable-of-repetition exception based on a likelihood of recurrence as to others.[8]

The notion of prudential mootness, acknowledges that while Plaintiffs might not be impacted by a future Legislative Directive during the remainder of this legislative session, it is undoubtable that if not reviewed and Defendants' behaviors go unchecked, future members of the LCB will be emboldened to arbitrarily violate individuals constitutional rights and arbitrarily preclude individuals from engaging in their First Amendment rights.

1.  **Defendants' Analysis Regarding Mootness is Fatally Flawed- This Action Does Not Involve the Repeal of Legislation**.

Defendants recitation to cases supporting the idea that this matter is moot is erred in the simple fact that this matter has nothing to do with legislation that is repealed.

The repeal, amendment, or expiration of challenged legislation is generally enough to render a case moot and appropriate for dismissal. *Lewis v. Cont'l Bank Corp.* , *494 U.S. 472, 478, 110 S.Ct. 1249, 108 L.Ed.2d 400 (*1990) (legislature's passage of amendments rendered case moot); *Burke v. Barnes* , *479 U.S. 361, 363, 107 S.Ct. 734, 93 L.Ed.2d 732 (1987) (expiration of legislation rendered case moot); Kremens v. Bartley* , *431 U.S. 119, 127–28, 97 S.Ct. 1709, 52 L.Ed.2d 184* (1977) (legislature's repeal and replacement of legislation rendered case moot). *Bd. of Trs. of Glazing Health & Welfare Tr. v. Chambers*, *941 F.3d 1195 (9th Cir. 2019)*

---

[7] *Hall v. Beals, 396 U.S. 45, 49-50.*
[8] See, *Storer v. Brown, 415 U.S. 724, 737 n.8 (1974) (finding case not moot based on likelihood of recurrence as to others)*

Despite this general rule, the Supreme Court has in some instances held that a case was not moot even when the government had repealed or amended a challenged statute or ordinance. For example, in *City of Mesquite v. Aladdin's Castle, Inc.*, the Supreme Court refused to dismiss an appeal as moot where a city had revised a challenged ordinance but was reasonably expected to reenact offending provisions because it had announced its intention to do so. *455 U.S. 283, 289 & n.11, 102 S.Ct. 1070, 71 L.Ed.2d 152 (1982)*. In *Northeastern Florida Chapter of the Associated General Contractors of America v. City of Jacksonville* , the Court similarly refused to dismiss an appeal as moot after a city had entirely repealed and replaced a challenged ordinance because the replacement ordinance disadvantaged plaintiffs only "to a lesser degree" than the original one. *508 U.S. 656, 662–63, 113 S.Ct. 2297, 124 L.Ed.2d 586 (1993)*.

In *Thalheimer v. City of San Diego* , the 9th Circuit emphasized that concerns about a government's evasion of judicial review are "of particular force" where voluntary cessation "occur[s] only in response to the district court's judgment." *645 F.3d 1109, 1126 (9th Cir. 2011) (quoting Jacobus v. Alaska , 338 F.3d 1095, 1103 (9th Cir. 2003) )*. In *Jacobus v. Alaska* , the Court noted that "mootness is less appropriate when repeal [of legislation] occurred due to the 'prodding effect' of litigation." *338 F.3d at 1103 (quoting Smith v. Univ. of Wash. Law School , 233 F.3d 1188, 1194 (9th Cir. 2000) )*. And in *Coral Construction Co. v. King County* , the Court stated that "even if the government is unlikely to reenact the provision, a case is not easily mooted where the government is otherwise unconstrained should it later desire to reenact the provision." *941 F.2d 910, 928 (9th Cir. 1991) (citing City of Mesquite , 455 U.S. at 289 n.10, 102 S.Ct. 1070 )*.

Generally, the "expiration of challenged legislation ... render[s] a case moot." *Glazing Health* , *941 F.3d at 1198*. But a case challenging expired legislation remains justiciable when

the litigant still "need[s] ... the judicial protection that it sought." *See Jacobus v. Alaska*, *338 F.3d 1095, 1102–03 (9th Cir. 2003) (quoting Adarand Constructors, Inc. v. Slater*, *528 U.S. 216, 224, 120 S.Ct. 722, 145 L.Ed.2d 650 (2000) (per curiam)), overruled on other grounds by Glazing Health*, *941 F.3d 1195.*

As stated above, this action has nothing to do with Legislation that was repealed or a course of conduct occurring in a legally justifiable manner. This matter involves a deliberate, intentional and unjustified course of conduct that precluded Plaintiffs from exercising their First Amendment rights by violating Article IV § 15 of the Nevada Constitution.

## C.   DEFENDANTS DO NOT HAVE ABSOLUTE IMMUNITY

Immunity is an affirmative defense that protects an individual from liability for alleged wrongful conduct. In general, immunity attaches to the *particular act performed* by the official, not to the official's title.[9]  To benefit from immunity, the defendant must plead immunity. *Harlow v. Fitzgerald, 457 U.S. 800, 815 (1982).* Thus, an official may receive absolute, qualified, or no immunity, depending <u>*on the act performed.*</u> [*Emphasis added*] *Stump v. Sparkman, 435 U.S. 349, 351, 364 (1978).* Although an immunity defense is an affirmative defense, the plaintiff must anticipate the immunity defense. *Mitchell v. Forsyth, 472 U.S. 511, 530 (1985).*

The Supreme Court has recognized two levels of immunity for public officials: absolute and qualified. Both levels of immunity protect only discretionary acts performed by public officials. *Harlow v. Fitzgerald, 457 U.S. 800, 807 (1981).*

Thus, most government officers receive only qualified immunity, *see, e.g., Harlow v. Fitzgerald, 457 U.S. 800, 807 (1982)*, under which they are often shielded but may be sued if

---

[9] Black's Law Dictionary defines immunity to be "[e]xemption... from ... performing duties which the law generally requires other citizens to perform." BLACK'S LAW DICTIONARY 751 (6th ed. 1990).

they violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Id. at 818*. Select groups of officials are entitled to absolute immunity, but only for such sensitive government functions as legislating, adjudicating, or prosecuting. *See id. at 807 (summarizing narrow range of activities to which absolute immunity applies)*. Unlike sovereign immunity, this absolute immunity is based on function; thus, for instance, a judge is absolutely immune for judicial rulings*, see, e.g., Stump v. Sparkman, 435 U.S. 349, 359- 60 (1978)*, but not personnel decisions, *see Forrester v. White, 484 U.S. 219, 229-30 (1988)*.

Recognizing that other governmental officers and sometimes even non-governmental individuals perform the same functions that trigger absolute immunity for judges and prosecutors, courts have extended absolute immunity to individuals engaged in such functions as judging and prosecuting—but only to the extent that the individuals are engaged in those functions. *See, e.g., Butz v. Economou, 438 U.S. 478, 512- 14 (1977) (agency adjudicator entitled to judicial immunity); Int'l Union, UAW v. Greyhound Lines, Inc., 701 F.2d 1181, 1185 (6th Cir. 1983) (arbitrator entitled to judicial immunity)*

Absolute immunity provides complete protection from suit, regardless of the intent or malice behind the allegedly wrongful act. *Pierson v. Ray, 386 U.S. 547, 554 (1967); Bradley v. Fisher, 80 U.S. (13 Wall.) 335, 347 (1871)*.

In contrast, qualified immunity protects public officials from civil liability only if the law governing the conduct is unclear, such that the official did not know that he or she was violating the individual's constitutional rights. Officials are not immune if they fail to follow a clear legal standard.  *Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)*. The immunity defense ordinarily fails where the law was clearly established because reasonably competent public officials should know the law governing their own conduct. *Id. at 818-19.*

This Court's analysis when determining whether Defendants are allocated absolute or qualified immunity rests in the action that was taken by Defendants and the discretionary basis that Defendants engaged in that action.

To be crystal clear, Defendants' actions had nothing to do with legislation. Further Defendants actions were not reliant on a COVID-19 Executive Directive precluding the Legislative Building from opening. It is significant to note that other State, County and Municipal buildings were open to the public, such as District and Municipal Courts, City Halls, County Commission offices in various Counties. Defendants' actions of preventing Plaintiffs and the public from entry into the building was an ad hoc arbitrary determination based in whole on the random and arbitrary decision of Defendants, unsupported by any lawful directive meriting same.

Further, Defendants' reliance on a legal opinion issued by Counsel for LCB does not justify Defendants engaging in constitutional violations of Plaintiffs' rights in this matter.

**D.     THE STANDARD FOR A 1983 ACTION AND IMMUNITY**

To state a claim under § 1983, a plaintiff must allege: (1) that a right secured by the Constitution or laws of the United States was violated; and (2) that the alleged violation was committed by a person acting under color of state law. *See West v. Atkins, 487 U.S. 42, 48 (1988).* Individuals are entitled to qualified immunity against claims of constitutional violations, unless: (1) there has been a constitutional violation; and (2) the state of the law was clear enough at the time of the violation that a reasonable person in the defendant's position would have  known his actions violated the plaintiff's rights. *Saucier v. Katz, 533 U.S. 194, 201 (2001).* A court has discretion to analyze the second prong of the *Saucier* test first in order to avoid unnecessary constitutional rulings. *Pearson v. Callahan, 555 U.S. 223, 236 (2009).*

In *Fields v. Wharrie, 740 F.3d 1107 (7th Cir. 2014),* the Court of Appeals for the Seventh Circuit held that a prosecutor cannot transform qualified immunity into absolute immunity by the introduction of fabricated evidence at trial. *Fields, 740 F.3d at 1114.*

The point of absolute legislative immunity is to protect the democratic decision-making process from the chilling effect of lawsuits, as well as from liability.  Absolute immunity extends beyond state legislative conduct to include regional and local legislative conduct as well. *Lake County Estates v. Tahoe Regional Planning Authority*, *440 U.S. 966 (1979) (regional legislators); Bogan v. Scott-Harris, 523 U.S. 44 (1998) (local legislators).*

However, that the Court takes a functional approach to immunity, so that legislative immunity applies only to ***legislative acts and not  administrative acts.***

The rule is well settled, that where the law requires absolutely a ministerial act to be done by a public officer, and he neglects or refuses to do such act, he may be compelled to respond in damages to the extent of the injury arising from his conduct").  *Bogan v. Scott-Harris, 523 U.S. 44, 52 (1998).*

Regardless of the level of government, the exercise of legislative discretion should not be inhibited by judicial interference or distorted by the fear of personal liability. *Id. citing to Spallone* v. *United States, 493 U. S. 265, 279 (1990*) (noting, in the context of addressing local legislative action, that "any restriction on a legislator's freedom undermines the 'public good' by interfering with the rights of the people to representation in the democratic process"); *see also Kilbourn* v. *Thompson,* 103 U. S., at 201-204 (federal legislators);

Here, as stated *supra*, Plaintiffs' Complaint demonstrates that constitutional violations occurred by the closure of the Legislative building during the 81st Legislative Session, and two more sessions preceded by same. Plaintiffs have a constitutional right to petition their

government for redress. Plaintiffs also have a State constitutional right to access to the Legislative Building under Article IV §15. Defendants are not allowed to close the Legislative Building under said Article to preclude Plaintiffs' and the public from lobbying in said building.

Here in order for Defendants to have qualified immunity, the court employs a two prong analysis: 1) did the officers violate a constitutional right; and 2) was the right clearly established at the time of the violation. If officers did not violate a constitutional right that was clearly established, then the "doctrine of qualified immunity protects" them "from liability for civil damages." *Pearson v. Callahan*, *555 U.S. 223, 231 (2009) (quoting in part Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).*

If the officers did not violate a constitutional right the inquiry ends. It is only if the Court concludes that the officer did violate a constitutional right that the second prong of the analysis is necessitated. To surmount the "clearly established" threshold, "a right must be sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Reichle v. Howards*, 566 U.S. 658, 664 (2012).

Thus, in determining immunity, we examine "the nature of the function performed, not the identity of the actor who performed it." *Forrester v. White, 484 U. S. 219, 229 (1988).*

### 1.    Plaintiffs Have a Clear Constitutional Right to Petition the Government For Redress

The Petition section of the First Amendment, also commonly referred to as the Petition Clause, states that "People have the right to appeal to government in favor of or against policies that affect them or in which they feel strongly.  This freedom includes the right to gather signatures in support of a cause and to lobby legislative bodies for or against legislation," *(Copley, First Amendment Center).*

A more simple definition of the right to petition, is "the right to present requests to the government without punishment or reprisal.  This right is guaranteed in the First Amendment to the U.S. Constitution" *(History Central, 1)*. Looking at the specific definition of the word petition, as it relates to the freedom of petition and the First Amendment, the word can be used to describe "any nonviolent, legal means of encouraging or disapproving government action, whether directed to the judicial, executive or legislative branch.

Lobbying, letter-writing, e-mail campaigns, testifying before tribunals, filing lawsuits, supporting referenda, collecting signatures for ballot initiatives, peaceful protests and picketing: all public articulation of issues, complaints and interests designed to spur government action qualifies under the petition clause…" *(Copley First Amendment Center)*.

The right to petition includes a negative right to be free from retaliation for, or suppression of, petitioning activity. *See, e.g., BE & K Constr. Co. v. NLRB, 536 U.S. 516, 536 (2002); Prof'l Real Estate Inv'rs, Inc Columbia Pictures Industries, Inc., 508 U.S. 49, 56.60-61 (1993).* The activity of lobbying has been interpreted by court rulings as constitutionally protected free speech and a way to petition the government for the redress of grievances, two of the freedoms protected by the First Amendment of the Constitution. *United States v. Harriss, 347 U.S. 612 (1954), United Mine Workers of America, District 12 v. Illinois State Bar Association Et Al., 389 U.S. 217 (1967), Railroad Trainmen v. Virginia Bar, 377 U. S. 1 (1964),* and *NAACP v. Button, 371 U. S. 415 (1963)*.

In *United Mine Workers of America v. Illinois State Bar Association (1967)*, the Supreme Court exalted the right as "among the most precious liberties safeguarded by the Bill of Rights" and implicit in "the very idea of government." The Court had earlier affirmed the right to engage

17

in such activity; it thus deemed it a fundamental liberty, protected against encroachment by federal, state and local governments.

Hence, in *NAACP v. Button, 37 U.S 415, (1963)*, it formed the conceptual basis for the Court's ruling that a civil rights group could not be barred from soliciting people to serve as litigants in civil rights cases. The Court declared: "Litigation may well be the sole practical avenue open to a minority to petition for a redress of grievances." *Id.*

In *McDonald v. Smith, 472 U.S. 479 (1985)*, the Supreme Court case held that the right to petition does not provide absolute immunity to petitioners; it is subject to the same restrictions as other First Amendment rights. The Ninth Circuit has repeatedly stated that "[t]o obtain relief on a procedural due process claim, the plaintiff must establish the existence of (1) a liberty or property interest protected by the constitution; (2) a deprivation of the interest by the government; 3) lack of process."  *See Shanks v Dessel, 540 F.3d 1082, 1090 (9th Cir. 2008).* Procedural due process concerns are not satisfied simply by providing notice and a hearing.

The Ninth Circuit has firmly ruled that procedural due process is violated when an adjudicative decision maker deprives a person of protected property interests on the grounds of bias, prejudice, partiality, or maliciousness, regardless of whether there was notice and/or a hearing. *Clements v Airport Authority of Washoe County, 69 F.3d 321, 333 (9th Cir. 1995).*

Here, Plaintiffs are precluded from entering the Legislative Building to exercise their First Amendment rights of Freedom of Speech and Petition without notice of same or any due process.  The First Amendment to the United States Constitution provides:

> Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances. [Emphasis added] Id.

In *Gitlow v New York 268 US 652 (1925)*, the Supreme Court applied protection of free speech to the states through the due process clause of the Fourteenth Amendment. Additionally, this was also confirmed in as a variant in *Buckley v. American Constitutional Law Foundation, Inc., 525 U.S. 182 (1999)*, the Supreme Court case that dealt with the authority of states to regulate the electoral process, and the point at which state regulations of the electoral process violate the First Amendment freedoms.

Similarly, in *Index Newspapers v. U.S Marshals, Service, No. 20-35739 (9th Cir. 2020)*, the Ninth Circuit cites to *Press-Enterprise II*, the Supreme Court articulated a two-part test to determine whether a member of the public has a First Amendment right to access a particular place and process. *Press-Ent. Co. v. Superior Court of Cal., 478 U.S. 1 (1986)*.

First, a court must ask "whether the place and process has historically been open to the press and general public" and "whether public access plays a significant positive role in the functioning of the particular process in question." *Id. at 8*. If a qualified right of access exists, the government can overcome that right and bar the public by showing that it has "an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest." *Id. at 9*.

Here, it is indisputable that Plaintiffs have had access to the Legislative building and have entered the building to lobby prior to COVID-19 closures. It is also indisputable that the spirit of petitioning the government exists through lobbying during legislative sessions and without in-person access to the legislative body and fellow lobbying colleagues, the right to petition the government becomes insignificant.

Plaintiffs were precluded from adequately presenting legislation, from engaging in meaningful lobbying with colleagues and legislators inside the building, and testimony was limited to all testimony introduced.

The Ninth Circuit in *Fed. Election Comm'n v. Furgatch, 869 F.2d 1256, 1263 n.5 (9th Cir. 1989)* instructs courts to consider five factors when determining whether conduct is likely to occur in the future: (1) the degree of scienter involved; (2) the isolated or recurrent nature of the infraction; (3) the defendant's recognition of the wrongful nature of his conduct; (4) the extent to which the defendant's professional and personal characteristics might enable or tempt him to commit future violations; and (5) the sincerity of any assurances against future violations. *Id.*

It is clear by the Defendants' insolent tone of their Motion to Dismiss, that they clearly believe that their actions of shutting down the Legislative Building, despite other State, County and Municipal buildings being open in Nevada was justified. This arrogant display of arbitrary power is simply an indication that Defendants will not only likely repeat this conduct, they will not cease repeating this conduct unless ordered otherwise.

Plaintiffs were deprived of their liberties, and consequently, their ability to lawfully lobby the Legislature without unconstitutional government overreach. Furthermore, because Defendants' decisions were made in reliance upon an arbitrary and capricious interpretation of the Nevada Constitution and related laws and statutes with respect to their ability to order a closure of the Legislative Building and eradication of lobbying, Plaintiffs suffered irreparable harm and were deprived of their rights and liberties absent substantive due process of law, in violation of the Fourteenth Amendment to the U.S Constitution.

At its core, the Free Speech and Petition Clauses of the First Amendment to the U.S.

Constitution function as constitutional guarantees that no person or group will be denied

their protection under the law that is enjoyed by millions of Americans. The Supreme Court

has recognized that the First Amendment's protections extend to individual and collective

speech "in pursuit of a wide variety of political, social, economic, educational, religious, and

cultural ends." *Roberts v. U.S. Jaycees, 468 U.S. 609, 622 (1984).*

The Supreme Court has long considered political and ideological speech to be at the core

of the First Amendment, including speech concerning "politics, nationalism, religion, or other

matters of opinion." *W. Va. State Bd. of Educ. v. Barnette, 319 U.S. 624, 642 (1943).*

Political speech can take other forms beyond the written or spoken word, such as money,

e.g., *Buckley v. Valeo, 424 U.S. 1 (1976) (per curiam), or symbolic acts, e.g., Texas v. Johnson,*

*491 U.S. 397 (1989)*. A government regulation that implicates political or ideological speech

generally receives strict scrutiny in the courts, whereby the government must show that the law is

narrowly tailored to achieve a compelling government interest. *Id.*

Defendants' actions violate the First Amendment, both facially and as-applied to

Plaintiffs.  Strict scrutiny applies where, as here, the classification impinges on a fundamental

right – the right to free speech and the right to petition the Government for a redress of

grievances, among others.

Defendants cannot satisfy strict scrutiny because their arbitrary actions were not narrowly

tailored measures that further compelling government interests, for the reasons stated above.

There can be no compelling government interest when other State, County and Municipal

buildings are open to the public and open for business, but "the peoples building" remained

closed.

Indeed, the closure of governmental proceedings has been deemed proper in several instances where the government's interest was arguably less immediate and the restriction on access was equally broad. *Cf., e.g., Dhiab v. Trump, 852 F.3d 1087, 1095 (D.C. Cir. 2017)* (government's interest in preventing future threats to military operations would justify closure of habeas proceedings); *U.S. v. Index Newspapers LLC, 766 F.3d 1072, 1087 (9th Cir. 2014)* (government's interest in secrecy justified closure of certain grand jury proceedings); *ACLU v. Holder, 673 F.3d 245, 252 (4th Cir. 2011)* (government's interest in integrity of ongoing fraud investigation justified sealing of complaints filed in False Claims Act actions).

Turning to the Nevada Constitution, since 1864, the Nevada Constitution has provided intrinsic and unalienable rights and liberties to its citizens. Chief among those rights and liberties are those found in Article I of the Nevada Constitution. Article I, §1, of the Nevada Constitution provides, in pertinent part, that "[a]ll men are by Nature free and equal and have certain inalienable rights among which are those of enjoying and defending life and liberty; Acquiring, Possessing and Protecting property and pursuing and obtaining safety and happiness…"

Similarly, Article I, §9, provides that every citizen may freely speak, write and publish his sentiments on all subjects being responsible for the abuse of that right; and no law shall be passed to restrain or abridge the liberty of speech or of the press. Additionally, Article I §10, provides that the people shall have the right freely to assemble together to consult for the common good, to instruct their representatives and to petition the Legislature for redress of Grievances.

**2.      Defendants Have No Defense to Violate Article IV §15 of the Constitution**

Article 4, §15, of the Nevada Constitution provides "[T]he doors of each House shall be kept open during its session, and neither shall, without the consent of the other, adjourn for more

than three days nor to any other place than that in which they may be holding their sessions. The meetings of all legislative committees must be open to the public, except meetings held to consider the character, alleged misconduct, professional competence, or physical or mental health of a person." *Id.*

Defendants violated Article 4 §15 by denying access to Plaintiffs by keeping the Legislative Building closed to access by Plaintiffs and the public.

**D.    THE 11ᵗʰ AMENDMENT DOES NOT PRECLUDE DECLARATORY RELIEF**

The Eleventh Amendment grants a State immunity from suit in federal court by citizens of other states, U.S. Const. amend. XI, and by its own citizens as well, *Hans v. Louisiana, 134 U.S. 1 (1890)*. Under *Puerto Rico Aqueduct & Sewer Authority v. Metcalf & Eddy, Inc., 506 U.S. 139, 147 (1993)*, an ordinary claim of Eleventh Amendment immunity encompasses a claim of immunity from suit.

Under the *Ex parte Young* exception to a state's Eleventh Amendment immunity from suit in federal court, a plaintiff may bring federal claims under §1983 asking for prospective declaratory or injunctive relief against state officials acting in their official capacities to enjoin their allegedly unconstitutional actions *209 U .S. 123, 15 -56 (1908)*. However, the exception can be applied only to prospective declaratory or injunctive relief because it "does not permit judgments against state officers declaring that they violated federal law in the past.", 506 U.S. 139, 16 (1999).

Thus, "declaratory relief isn't permitted under when it would serve to declare only past actions in violation of federal law: retroactive declaratory relief cannot be properly characterized a prospective." declaratory or injunctive relief against state officials acting in their official capacities to enjoin their allegedly unconstitutional actions, *209 U .S. 123, 15 -56 (1908)*.

Eleventh Amendment immunity is an affirmative defense that must be raised early in the proceedings to provide fair warning to the plaintiff." *Aholelei v. Dep't of Pub. Safety, 488 F.3d 1144, 1147 (9th Cir. 2007) (internal quotation marks omitted).* "Express waiver is not required; a state 'waive[s]its Eleventh Amendment immunity by conduct that is incompatible with an intent to preserve that immunity.' *Id. (quoting Ariz. ex rel. Indus. Comm'n v. Bliemeister (In re Bliemeister), 296 F.3d 858, 861 (9th Cir. 2002)).*

Here, the 11th Amendment does not apply as matter sub judice is a §1983 case which is excepted from 11th Amendment preclusion. Notwithstanding same, Defendants did not file a Motion to Dismiss as their responsive pleading to the Complaint, but filed an Answer, followed by a Motion to Dismiss and a subsequent Motion to continue the Rule 26 conference. Therefore, this Court should decline any arguments involving 11th Amendment defenses.

**E.    PLAINTIFFS' FEDERAL CLAIMS ARE EXCLUSIVE OF SUPPLEMENTAL JURISDICTION**

Pursuant to 28 U.S.C. § 1367(a), in any civil action in which the district court has original jurisdiction, the district court "shall have supplemental jurisdiction over all other claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III [of the Constitution]," except as provided in subsections (b) and (c).

Once judicial power exists under § 1367(a), retention of supplemental jurisdiction over state law claims under 1367(c) is discretionary." *Acri v. Varian Assoc., Inc., 114 F.3d 999, 1000 (9th Cir. 1997).* Under 28 U.S.C. § 1367(c), "[T]he district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if -- (1) the claim raises a novel or complex issue of State law, (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction, (3) the district court has dismissed all claims over which it has original jurisdiction, or (4) in exceptional circumstances, there are other

compelling reasons for declining jurisdiction." The Supreme Court has cautioned that "if the federal claims are dismissed before trial, . . . the state claims should be dismissed as well." *United Mine Workers of America v. Gibbs, 383 U.S. 715, 726 (1966).*

Here the First Amendment Rights to the Free Speech and Petition Clauses are nots novel or complex issues of State law. Second, the State claim does not predominate over the claim over which the Court has original jurisdiction over, which is Defendants' violation of Plaintiffs' First, Fifth and Fourteenth Amendment rights nor has this Court dismissed Plaintiffs' federal claims. Even if this Court dismissed the supplemental action, Plaintiffs First, Fifth and Fourteenth Amendment claims would survive and would be the underlying subject of the 1983 action *sub judice*.

**F.  THIS COURT SHOULD DEFER RULING ON THIS MOTION FOLLOWING LIMITED DISCOVERY**

The civil-rights statute, 42 U.S.C. § 1983, enables those individuals whose rights were deprived by persons acting under color of state law to bring their claims in federal court.   On its face, § 1983 does not include any defense of immunity. Nevertheless, the Supreme Court has recognized that when Congress enacted § 1983, it was aware of a well-established and well-understood common-law tradition that extended absolute immunity to individuals performing functions necessary to the judicial process. *See Forrester v. White, 484 U.S. 219, 225–26, 108 S.Ct. 538, 98 L.Ed.2d 555 (1988); Imbler v. Pachtman, 424 U.S. 409, 418–24, 430, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976).*

Thus, it was presumed that if Congress had wished to abrogate common-law immunity, it would have done so expressly. *Buckley v. Fitzsimmons, 509 U.S. 259, 268, 113 S.Ct. 2606, 125*

*L.Ed.2d 209 (1993); Pierson v. Ray, 386 U.S. 547, 554–55, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967).*

The Supreme Court in *Imbler* laid down an approach that granted state actors absolute immunity only for those functions that were critical to the judicial process itself.   *See Imbler, 424 U.S. at 430, 96 S.Ct. 984;  see also Burns v. Reed, 500 U.S. 478, 486, 111 S.Ct. 1934, 114 L.Ed.2d 547 (1991).*

The Supreme Court expressed that '[T]he presumption is that qualified rather than absolute immunity is sufficient to protect government officials in the exercise of their duties. We have been quite sparing in our recognition of absolute immunity, and have refused to extend it any further than its justification would warrant.' "   Antoine, 508 U.S. at 433 n. 4, 113 S.Ct. 2167 (quoting Burns, 500 U.S. at 486–87, 111 S.Ct. 1934).   The burden is on the official claiming absolute immunity to identify the common-law counterpart to the function that the official asserts is shielded by absolute immunity.   Id. at 432, 113 S.Ct. 2167;  Malley, 475 U.S. at 339–40, 106 S.Ct. 1092.

To the extent, however, that social workers also ***make discretionary decisions*** and recommendations that are not functionally similar to prosecutorial or judicial decisions, only qualified, not absolute immunity, is available.   *MILLER v. Nevada Child And Family Services Department; Nevada Child Welfare Division; State of Nevada;  Volunteers of America of Nevada, 01-15491 (2003).*

Therefore, before this Court grants any dismissal, Plaintiffs are entitled to engage in limited discovery to present this Court whether Defendants have any immunity or not.

## CONCLUSION

For the foregoing reasons, Plaintiffs request that the Court deny the Motion to Dismiss Complaint, and continue all proceedings allowing for sufficient discovery on this matter in the interest of fair play and substantial justice.

Dated this 16th day of May, 2021.

CHATTAH LAW GROUP


*/s/ Sigal Chattah*
SIGAL CHATTAH, ESQ.
Nevada Bar No.: 8264
CHATTAH LAW GROUP
5875 S. Rainbow Bl., Ste. 204
Las Vegas, Nevada 89118
Tel: (702) 360-6200
Attorney for Plaintiffs

## CERTIFICATE OF SERVICE

I certify that on May 16, 2021 I electronically transmitted the foregoing Response to Defendants' Motion to Dismiss hereto to the office of the Clerk of the United States District Court for the District of Nevada using the Court's CM/ECF System for filing and transmittal of a Notice of Electronic Filing to all counsel of record in this matter; all counsel being registered to receive the electronic filing.

Dated this 16th day of May, 2021.

CHATTAH LAW GROUP
By: */s/ Sigal Chattah*
Sigal Chattah, Esq.
Attorney for Plaintiffs
